UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON

| | | |
|---|---|---|
| S&T OIL EQUIPMENT & MACHINERY LTD., | ) | FILED UNDER SEAL |
| VALERIAN SIMIRICA, | ) | |
| | ) | |
| vs. | ) | Cause No. H-11-542 |
| | ) | |
| JURIDICA INVESTMENTS, LTD., | ) | |
| JURIDICA CAPITAL MANAGEMENT LIMITED | ) | |
| JURIDICA CAPITAL MANAGEMENT (US) INC.) | | |

**BRIEF IN SUPPORT OF MOTION TO DISMISS IN FAVOR OF ARBITRATION**

Plaintiffs signed an Investment Agreement that requires them to submit all disputes with Juridica Investments Limited ("JIL") and its agents to binding arbitration. Indeed, the agreement's first page includes the following capitalized, boldface text, which is conspicuously placed just above the date – "THIS AGREEMENT IS SUBJECT TO BINDING ARBITRATION." Plaintiffs were fully aware of this provision - before executing it, their lawyers provided a letter expressly stating that any court presented with an action or proceeding "arising out of or relating to the Investment Agreement . . . would [be] governed by the mandatory arbitration provisions of Section 15."

Despite the above facts and despite JIL's prior filing of an arbitration against them, Plaintiffs initiated this case. There is no factual or legal basis for ignoring the Agreement's mandatory arbitration provision, and Defendants hereby move to dismiss the Complaint pursuant to Section 15.2 of the parties' Agreement, the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"), and the Federal Arbitration Act (the "FAA").

## I.   STATEMENT OF FACTS

Juridica Investments Limited ("JIL") is a limited company organized and existing under the laws of Guernsey, Channel Islands, which is its sole place of business.  (Sullivan Aff. ¶ 4.)[1] JIL provides strategic capital to the business community and the legal markets for corporate claims, otherwise referred to as "alternative litigation finance." *Id.* at ¶ 5.  This market is an alternative to more traditional forms of financing litigation, including self-financing or financing through attorney contingency fees. *Id.*  JIL participates in one segment of this broader market, focusing exclusively on providing litigation financing to sophisticated businesses that are involved in expensive, complex, high-risk commercial legal disputes.  *Id.*

JIL has an Investment Management Agreement with Defendant Juridica Capital Management Limited ("JCML"), which is also a limited company organized and existing under Guernsey law. *Id.* at ¶ 6.  JCML's sole place of business is in Guernsey.  *Id.*  The other Defendant, Juridica Capital Management (US) Inc. ("JCMUS"), is a Delaware corporation and an indirect, wholly-owned subsidiary of JCML. *Id.*  JCMUS was incorporated on November 14, 2008 – more than five (5) months after Plaintiffs executed the Agreement with JIL.  *Id.*

Plaintiff Valerian Simirica is a sophisticated, international businessman. *Id.* at ¶ 8. Through his company, Plaintiff S&T Oil Equipment and Machinery Ltd., Simirica purchased a large, formerly state-owned industrial company in Romania that was privatized by the government of Romania in 2002. *Id.*  The company – Nitramonia SA – converted natural gas into ammonia.  At one point, Nitramonia accounted for 20% of Romania's daily natural gas consumption.  *Id.* at ¶ 11.

---

[1] Mr. Sullivan's affidavit is attached hereto as Exhibit 1.

In 2007, the Romanian government terminated the privatization contract with Plaintiffs, seized the Nitromonia assets, and sold them for scrap value. *Id.* at ¶ 12. In response, Plaintiffs hired the international law firm of King & Spalding LLP to file an international arbitration against the government of Romania (the "Romanian Arbitration"). *Id.* at ¶ 13. Plaintiffs filed the Romanian Arbitration in the International Center for the Settlement of Investment Disputes ("ICSID"), which is located in Washington D.C. *Id.* Plaintiffs also filed an action in a Romanian court to challenge the seizure. *Id.*

In 2008, Plaintiffs sought an investor to finance the Romanian Arbitration. *Id.* at ¶¶ 9, 14. Plaintiffs engaged Global Arbitration Litigation Services Ltd. ("GALS") – a company based in London – to identify and solicit potential investors. *Id.* at ¶¶ 9-10. GALS approached JIL about investing in the Romanian Arbitration, and, because the arbitration fell within the type of sophisticated, commercial cases in which it typically invests, JIL agreed. *Id.* at ¶¶ 9, 14.

JIL and Plaintiffs subsequently negotiated and executed the Investment Agreement, which was filed with the Court by Plaintiffs (the "Agreement," attached as Exhibit 2 to Mr. Simirica's affidavit in support of Plaintiffs' motion for injunctive relief). *Id.* at 15. Under that Agreement, JIL agreed to reimburse Plaintiffs' counsel for certain fees incurred to that date and to make certain funds available to cover the remaining costs of the Romanian Arbitration. *Id.* JIL's total investment under the Agreement was to be in excess of $2.8 million. *Id.*

The Agreement includes a mandatory arbitration provision that requires all disputes between the parties and other identified entities to be submitted to binding arbitration. *Id.* at ¶ 16. In fact, the very first page of the Agreement notified Plaintiffs of this fact. Only four pieces of information are contained on this page – the parties to the agreement, the date, a copyright

notice, and the following sentence, in at least 14 point, bold type: "THIS AGREEMENT IS

SUBJECT TO BINDING ARBITRATION." *Id.*

Section 15.0 then contains nine (9) separate paragraphs setting forth the scope and details

of the arbitration provision. *Id.* at ¶ 17. Specifically, Section 15.2 states that all disputes –

regardless of the theory of liability – are subject to arbitration:

> Except as otherwise (but only to the extent) specified in Section 16
> [which deals with foreclosing on security interests], all actions,
> disputes, claims and controversies under common law, statutory
> law or in equity of any type or nature whatsoever, whether arising
> before or after the date of this Agreement and whether directly or
> indirectly relating to: (a) this Agreement and/or any amendments
> and addenda hereto, or the breach, invalidity or termination hereof;
> (b) any previous or subsequent agreement between ASSIGNEE
> AND ASSIGNTORS; (c) any act committed by ASSIGNEE or by
> any parent company, subsidiary or affiliated company of
> ASSIGNEE (the "ASSIGNEE Companies"), or by any employee,
> agent, officer or director of an ASSIGNEE Company whether or
> not arising within the scope and course of employment or other
> contractual representation of the ASSIGNEE Companies (provided
> that such act arises under a relationship, transaction or dealing
> between ASSIGNEE and ASSIGNORS); (d) any act committed by
> ASSIGNORS or by any parent company, subsidiary or affiliated
> company of S&T (the "ASSIGNOR Companies"), or by any
> employee, agent, officer or director an of ASSIGNOR Company
> whether or not arising within the scope and course of employment
> or other contractual representation of ASSIGNOR Companies
> (provided that such act arises under a relationship, transaction or
> dealing between ASSIGNEE and ASSIGNORS); and/or (e) any
> other relationship, transaction or dealing between ASSIGNEE and
> ASSIGNOR (collectively the "Disputes"), will be subject to and
> resolved by binding arbitration.

*Id.* at ¶ 17.

Section 15.3 provides that all arbitrations under the Agreement shall be conducted in

accordance with the Rules of the London Court of International Arbitration (the "LCIA"). *Id.* at

18. Section 15.4 provides that the "seat and situs of the arbitration and of all oral arbitration

hearings will be in St. Peter Port, Guernsey, Channel Islands" – the site of JIL's sole place of

business and the jurisdiction under whose laws JIL is organized. *Id.* at 19. The Agreement also

provides that it shall be governed by the laws of England and Wales. *Id.* at ¶ 20; Agreement §

14.2.1.

Prior to executing the Agreement, Plaintiffs obtained an opinion from Stuart Spiegel of

the Law Offices of Spiegel and DeMars in Chicago, Illinois, with respect to the enforceability of

the arbitration provision. *Id.* at ¶¶ 21-22. In a written opinion dated May 23, 2008 (five days

before Plaintiffs entered into the Investment Agreement), Mr. Spiegel advised Plaintiffs that the

Agreement was governed by the laws of England and Wales and that it contained a mandatory

arbitration provision that would be enforced by state and federal courts in Plaintiffs' home

jurisdiction, Illinois:

> In any action or proceeding arising out of or relating to the
> Investment Agreement in any court of the State of Illinois or in any
> federal court sitting in the State of Illinois, such court would
> recognize and give effect to the provisions of the Investment
> Agreement wherein the parties thereto agree that the Investment
> Agreement shall be governed by, and construed in accordance
> with, the laws of England and Wales and that all Disputes are
> governed by the mandatory arbitration provisions of Section 15.

*Id.* at 22, Exh. 1.

JIL paid more than $2.8 million in fees and costs under the Investment Agreement

throughout 2008 and 2009. *Id.* at ¶ 23. In August 2009, King & Spalding, Plaintiffs' counsel in

the Romanian Arbitration, abruptly withdrew. *Id.* at ¶ 24. In its follow-up investigation, JIL

learned that Plaintiffs had made material misrepresentations and omissions during the time

period leading up to execution of the Agreement. *Id.* JIL responded by filing a request for

arbitration with the LCIA against Plaintiffs on December 22, 2010, alleging breach of the

Agreement, fraud and related claims. *Id.*

Plaintiffs have thus far refused to respond to the pending arbitration in the LCIA. *Id.* at ¶

25. Instead, Plaintiffs filed this action on February 14, 2011. *Id.* Plaintiffs' Complaint alleges

claims against JIL, JCML and JCMUS. Plaintiffs purport to plead claims for RICO under 18

U.S.C. §1962; interference with a contractual relationship; fraud; conspiracy; aiding and

abetting breach of fiduciary duty; declaratory judgment and an injunction. *Id.* at 26; Dkt. No. 1.

## II.  ARGUMENT

Plaintiffs' attempt to circumvent the Agreement's mandatory arbitration provision

implicates two (2) federal statutes – the Convention on the Recognition and Enforcement of

Foreign Arbitral Awards (9 U.S.C. §§ 201 *et seq.*) and the Federal Arbitration Act (9 U.S.C. §§ 1

*et seq.*). Both statutes require dismissal.

### A.  The Convention applies and requires Plaintiffs to arbitrate their claims.

Congress enacted the Convention as a means of enforcing international arbitration

agreements in much the same manner that the FAA enforces all other arbitration agreements.

The Convention therefore explicitly provides for the enforcement of commercial arbitration

agreements that involve a foreign citizen or where the parties' "relationship involves property

located abroad, envisages performance or enforcement abroad, or has some other reasonable

relation with one or more foreign states." 9 U.S.C. § 202.

The Convention and the FAA are found in the same part of the U.S. Code and the Fifth

Circuit has instructed that they operate "concurrently" with one another. *See Freudensprung v.

Offshore Technical Servs., Inc.*, 379 F.3d 327, 341 (5th Cir. 2004). The same strong

presumption in favor of arbitration therefore applies under both the FAA and the Convention.

*See, e.g., Cater v. Countrywide Credit Industr., Inc.*, 362 F.3d 294, 297 (5th Cir. 2004) ("There is

a strong presumption in favor of arbitration and a party seeking to invalidate an arbitration

agreement bears the burden of establishing its invalidity."). As such, "ambiguities as to the

scope of the arbitration clause itself [are] resolved in favor of arbitration." *Volt Info. Sci., Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 475-76 (1989). "Whenever the scope of an arbitration clause is in question, the court should construe the clause in favor of arbitration." *City of Meridian*, 721 F.2d 525, 527 (5th Cir. 1983). As the Supreme Court has instructed:

> [Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.... The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay or a like defense to arbitrability.

*Moses H. Cone Memorial Hospital v. Mercury*, 460 U. S. 1, 25 (1983).

The Fifth Circuit has determined that "courts conduct only a very limited inquiry" in determining whether to enforce an arbitration clause under the Convention. *Freudensprung v. Offshore Technical Services, Inc.*, 379 F.3d 327, 339 (5th Cir. 2004) (citing *Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co.*, 767 F.2d 1140, 1144-45 (5th Cir.1985)). According to these authorities, "a court should compel arbitration if (1) there is a written agreement to arbitrate the matter; (2) the agreement provides for arbitration in a Convention signatory nation; (3) the agreement arises out of a commercial legal relationship; and (4) a party to the agreement is not an American citizen." *Freudensprung*, 379 F.3d at 339. "[If] these requirements are met, the Convention requires the district court[ ] to order arbitration . . . unless it finds that the said agreement is null and void, inoperative or incapable of being performed." *Sedco*, 767 F.2d at 1146.

In this case, all of the *Freudensprung* factors are satisfied, and Plaintiffs are required to arbitrate their claims.

1.      **There is a written agreement to arbitrate Plaintiffs' claims.**

As set forth above, the Agreement between the parties contains a mandatory arbitration

provision that requires all disputes between the parties to be submitted to binding arbitration.

(Agreement § 15.2.)  Section 15.2 applies to "all actions, disputes, claims and controversies

under common law, statutory law or in equity of any type or nature whatsoever, whether arising

before or after the date of [the] Agreement . . . ."  It applies to claims against JIL and "any parent

company, subsidiary or affiliated company . . . [and] any employee, agent. Officer or director . . .

."  *Id.*  Accordingly, there is no dispute that the Agreement's arbitration provision covers all of

Plaintiffs' claims in this case.

2.      **The Agreement provides for arbitration in a Convention signatory nation.**

Sections 15.3 and 15.4 require the arbitration to be filed with the London Court of

International Arbitration and the hearings to be conducted in Guernsey, Channel Islands.

According to the website maintained by the United Nations Commission on International Trade

Law, the United Kingdom of Great Britain and Northern Ireland is a signatory nation to the

Convention, and the United Kingdom extended the territorial protection of the Convention to

Guernsey in 1985.[2]

3.      **The Agreement arises from a commercial relationship.**

As described above, Plaintiffs' asserted claims arise from alleged acts committed in

connection with JIL's investment in Plaintiffs' international arbitration against the government

of Romania.  The parties' agreement to arbitrate undisputedly arises in connection with their

commercial relationship.

---

[2]  *See*  http://www.uncitral.org/uncitral/en/uncitral_texts/arbitration/NYConvention_status.html
(accessed on February 22, 2011).

4.    **JIL is not an American citizen; but, even if it were, the Convention would still apply because of the Agreement's connections to foreign states.**

The Convention provides that an entity is not a foreign citizen if "it is incorporated or has its principal place of business in the United States." 9 U.S.C. § 202. Plaintiffs admit that Juridica is organized under the laws of Guernsey. They contend, however, that JIL does not have its principal place of business in Guernsey. Instead, Plaintiffs allege that JIL is under the exclusive control of JCML and JCMUS and that this control is exercised from New York.

Plaintiffs assertions are simply not supported by the record. JIL is a closed-ended investment company whose shares are listed on the AIM, an alternative market operated by the London Stock Exchange. (Sullivan Aff. ¶ 5.) The overwhelming majority of JIL's shares are held by major British investment institutions. *Id.* JIL is incorporated in Guernsey; it maintains its only offices there; and its registered agent is located there. *Id.* at ¶ 5. JIL does not have any offices, officers or employees outside of Guernsey. *Id.*

JIL is controlled and directed by a three-member board of directors. *Id.* at ¶ 27. JIL's board consists of Lord Daniel Brennan, Q.C., a British citizen who lives in England; Richard D. Battey, a British citizen who lives in Guernsey; and J. Kermit Birchfield, and American citizen who lives in the United States. *Id.* JIL's board of directors meets in-person on a quarterly basis. *Id.* The vast majority of the board meetings have been conducted in Guernsey. *Id.*

All contracts entered into by JIL are executed and delivered in Guernsey. *Id.* at ¶ 28. JIL maintains its accounts in Guernsey; it holds its funds in banks located in Guernsey; it disburses funds used for its investments from Guernsey; and all proceeds JIL receives from its investments are remitted to bank accounts in Guernsey. *Id.*

The record evidence summarized here establishes that JIL is a citizen of Guernsey with

its principal place of business in Guernsey.

Moreover, even if there were a dispute as to the location of JIL's principal place of business (which JIL does not concede), the Convention still requires arbitration because the parties' "relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states." 9 U.S.C. § 202. The Convention applies even in cases involving U.S. citizens where "there is a 'reasonable relation' between the parties' commercial relationship and some 'important foreign element.'" *Freudensprung*, 379 F.3d at 339 (5th Cir. 2004) (citing *Jones v. Sea Tow Servs., Inc.*, 30 F.3d 360, 366 (2d Cir.1994); *Lander Co. v. MMP Investments, Inc.*, 107 F.3d 476, 481 (7th Cir.1997)). In other words, the Convention would apply here even if JIL's principal place of business were in New York so long as "there is a reasonable connection between the parties' commercial relationship and a foreign state that is independent of the arbitral clause itself." *Freudensprung,* 379 F.3d at 341.

There is an undeniable "foreign element" in the current dispute. Plaintiffs entered into a sophisticated commercial transaction with a Guernsey company that required arbitration in that company's home forum. The Investment Agreement itself says that it has been executed in Guernsey and that performance of its terms would occur in Guernsey. (Agreement ¶ 27.) JIL did in fact execute the Agreement in Guernsey, and it wired its investment under the Agreement from its Guernsey bank accounts. (Sullivan Aff. ¶ 28.) Performance in a foreign country qualifies an agreement for international arbitration by the very terms of the Convention, which states that a foreign arbitration clause must be enforced if the parties' contract "envisages performance or enforcement abroad." 9 U.S.C. § 202.

In addition, the "foreign element" of the case is supported by the fact that the underlying international arbitration for which JIL provided financing involved the purchase of a Romanian company and the Romanian government's subsequent expropriation of that property. These matters more than satisfy the required nexus with foreign nations to require Plaintiffs to arbitrate this matter in a foreign forum.

These foreign connections distinguish this matter from the case on which Plaintiffs rely in their Motion for a Temporary Restraining Order, *Ensco Offshore Co. v. Titan Marine, LLC*, 370 F. Supp. 2d 594 (S.D. Tex. 2005). *Ensco* was a dispute concerning an oil rig that was technically in international waters but was in fact just off the coast of Louisiana. *Id.* There were no other foreign contacts involved in Ensco. *Id.* None of the parties were from a foreign country, none of the facts of the dispute arose from events in a foreign forum and there was no performance anticipated in a foreign country. *Id.* Given the complete lack of a connection between the facts of *Ensco* and any foreign country, the court in that case had little difficulty finding that there was not a sufficient relationship with any foreign country for the case to be arbitrated under the Convention. *Id.* at 601.[3]

Because all of the *Freudensprung* factors are satisfied, Plaintiffs must arbitrate their claims, and the Complaint should be dismissed.

---

[3] *See., e.g., id.* at 601 ("The above-cited history indicates that Congress did not envision American companies with a dispute just off the Gulf Coast with eventual performance in Texas to be property, performance, or enforcement 'abroad.' Not one of the cases cited by the parties or found by the Court have found the Convention to apply to a situation where two American entities were entangled in an offshore dispute where the envisaged performance was in the United States.").

**B.     Alternatively, the FAA applies and requires Plaintiffs to arbitrate their claims.**

Even if the Convention did not apply, the Agreement falls within the FAA, and its arbitration provision must be enforced. The Federal Arbitration Act generally applies to arbitration provisions contained in contracts involving "commerce." 9 U.S.C. § 2. Section 1 defines "commerce" to include both interstate commerce and commerce with foreign nations. 9 U.S.C. § 1. Section 2 of the Act states that an arbitration clause "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity of the revocation of any contract." 9 U.S.C. § 2.

"Arbitration is 'a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Paine Webber Inc. v. The Chase Manhattan Private Bank (Switzerland),* 260 F.3d 453, 462 (5th Cir. 2001) (quoting *United Steel Workers of Amer. V. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582 (1960)). "Therefore, the Court must first determine whether there is a valid agreement between the parties to arbitrate their dispute." *Prothro v. Coca-Cola Enter. Inc.,* H-09-3716, 2010 U.S. Dist. LEXIS 5006, *7 (S.D. Tex. Jan. 22, 2010). "'Although there is a strong federal policy favoring arbitration, this federal policy . . . does not apply to the determination of whether there is a valid agreement to arbitrate between the parties.'" *Id.* (quoting *Will-Drill Resources, Inc. v. Samson Resources Co.,* 352 F.3d 211, 214 (5th Cir. 2003)). "In deciding whether the parties entered into a valid agreement to arbitrate, the Court applies general contract principles. *Id.*

There can be no dispute that the Agreement's arbitration provision applies to all of the claims Plaintiffs assert in their Complaint. Section 15.2 unambiguously requires arbitration of all disputes between the parties and other identified entities, including disputes relating to the Agreement and disputes relating to any act committed by JIL or any parent company, subsidiary,

12

Case 4:11-cv-00542   Document 17   Filed in TXSD on 02/23/11   Page 13 of 54

affiliated company or agent.  (Agreement § 15.2.)  This broadly worded provision applies to all of Plaintiffs' claims, including their claims under RICO and for fraud.  *See, e.g., Garrett v. Circuit City Stores, Inc.,* 449 F.3d 672, 677 (5th Cir. ) ("In cases involving the Sherman Act, the Securities Exchange Act of 1934, the civil protections of the Racketeer Influenced and Corrupt Organizations Act (RICO), and the Securities Act of 1933, the [Supreme] Court has held substantive statutory rights enforceable through arbitration.") (citing *Shearson/Am. Express, Inc. v. McMahon,* 482 U.S. 220, 242 (1987)); *Chevron Nig. Ltd. v. Contract Operators, Inc.,* 1:09-CV-821, 2010 U.S. Dist. LEXIS 40786, at *10-*11 (E.D. Tex. April 26, 2010) (holding that claims for fraud and tortious interference were governed by arbitration provision).

Accordingly, whether analyzed under the Convention or the FAA, Section 15.2 requires Plaintiffs to submit their claims to arbitration.

> **C.     None of Plaintiffs' defenses to the Agreement's arbitration provision have any merit -- the provision is not unconscionable; nor was it obtained by fraud.**

Attempting to avoid the Agreement's arbitration provision, Plaintiffs assert that the arbitration clause is unconscionable and cannot be enforced to require arbitration in Guernsey. They argue that the arbitration clause is substantively and procedurally unconscionable because (1) they believe LCIA arbitration is too burdensome; (2) a conflict of interest exists with the LCIA based on false speculation about one of JIL's board members; and (3) S&T did not have conflict-free representation in entering the Investment Agreement.  None of these contentions are supported by the record before the Court or settled precedent in this Circuit.

*First,* LCIA arbitration in Guernsey is no more burdensome than arbitration before a U.S. alternative dispute provider.  Plaintiffs primarily cite the cost of travel to Guernsey.  However, the LCIA rules make clear that any such trip would be at most a one-time cost, as the arbitration would only require a single in-person hearing.  That cost may never be incurred, as the LCIA

rules only require a hearing with live witnesses if one of the parties has demanded it, which has not yet occurred.  By contrast, Plaintiffs have not found it burdensome to bring this federal action many hundreds of miles away from their principal place of business in Illinois.  Indeed, they did not find it burdensome to purchase a business in Romania, which presumably would require frequent international travel to a location even further from Illinois than Guernsey, which has its own international airport, and is not far from either France or England.

The Guernsey arbitration is likely far less burdensome than this lawsuit, which Plaintiffs voluntarily filed.  Plaintiffs claim that the burdens of a Guernsey arbitration are excessive simply because of the costs of airfare. Comparing the costs of airfare to Houston with flights to Guernsey is simplistic at best.  The arbitration will require at most one flight to Guernsey.  This case, however, would likely require Simirica and other Illinois witnesses to make many trips to Houston for purposes of hearings, discovery and trial.  Given that a hearing is set in this matter for February 24, 2011, this case already has the same number of in-person hearings scheduled as is planned for the *entire* LCIA arbitration, even though the Complaint has just been filed. Plaintiffs therefore make an apples-to-oranges comparison by claiming that airfare to Guernsey exceeds airfare to Houston, which itself nearly reaches $1,000.  Even if the airfare rates Plaintiffs cite are correct, Plaintiffs simply ignore that they will incur these repeated costs in litigating this case over a period of years in this forum.

Indeed, the dispute underlying this case ultimately concerns Plaintiffs attempt to operate a business in Romania.  It is disingenuous for Plaintiffs to claim that it is unduly burdensome for them to arbitrate in a foreign forum when S&T and Simirica themselves agreed to operate a foreign corporation that undeniably would require frequent contacts with and travel to Romania.

Similarly, Plaintiffs bemoan the fact that the LCIA would require the appointment of a three-arbitrator panel, which obviously would cost more than having a single arbitrator.  A three-arbitrator panel is not unique to the LCIA.  A similar arbitration brought in the U.S. would very likely have a three-member arbitration panel given that the matter in dispute exceeds $1,000,000. *See* AAA Rules for Large, Complex Commercial Disputes, Rule L-2 (making three-arbitrator panels the norm for arbitrations where the amount in controversy is more than $1,000,000) (available at http://www.adr.org/sp.asp?id=22114); Financial Industry Regulatory Authority Rule 12401(c) ("If the amount of a claim is more than $100,000, exclusive of interest and expenses, or is unspecified, or if the claim does not request money damages, the panel will consist of three arbitrators, unless the parties agree in writing to one arbitrator.") (available at http://finra.complinet.com/en/display/display.html?rbid=2403&element_id=607).

Simirica is a sophisticated commercial businessman capable of transacting international business.  Plaintiffs have experience with international transactions, having purchased a commercial venture in Romania. It was no secret that the Investment Agreement included a binding arbitration clause, as the title page of the Investment Agreement includes the phrase: **"THIS AGREEMENT IS SUBJCET TO BINDING ARBITRATION."**  (Sullivan Aff. ¶ 16.) Given Plaintiffs' level of sophistication, they were more than capable of protecting their rights and deciding for themselves whether these procedures for dispute resolution were acceptable. Nothing about this process was unconscionable.  *See, e.g., Brown v. Pacific Life Ins. Co.*, 462 F.3d 384 (5th Cir. 2006) (declining to find unconscionable an arbitration clause in a financial services agreement).

*Second*, Plaintiffs' assert that the Investment Agreement is unconscionable or fraudulent because of an alleged conflict of interest between JIL and the LCIA due to a non-executive

director of JIL allegedly sat on the board for the LCIA. That allegation is demonstrably false, as the individual in question – Lord Daniel Brennan -- was never in fact on the Board of Directors for the LCIA. (Brennan Aff., Exhibit 2 to Defendants' Emergency Motion to Seal, ¶¶ 9, 10.) Lord Brennan is merely one of the 1,600 members of that well-known and often-used dispute resolution association. *Id.* ¶ 12. He has nothing to do with the selection of arbitrators and no influence on who sits on a given arbitration panel. *Id.* ¶ 14. The allegations to the contrary are not based on Mr. Simirica's personal knowledge and are mere speculation at best and an outright misrepresentation at worst.[4]

*Third*, Plaintiffs argue that the arbitration clause is unconscionable because they did not have separate counsel at the time they entered into the Investment Agreement and because, they assert, King & Spalding was conflicted. Again, Plaintiffs assertion is demonstrably false. As set forth in the Affidavit of Mr. Sullivan and the attached exhibit, Plaintiffs did in fact retain separate counsel for purposes of the transaction, and they received from their counsel a written opinion analyzing the Agreement's arbitration provision and stating that it was enforceable. (Sullivan Aff. ¶¶ 21-22.)

Accordingly, none of Plaintiffs' arguments against enforcing the arbitration provision have any merit.

---

[4] Indeed, the allegation is especially disconcerting given that a judge in this district has already found that Plaintiffs' counsel has brought litigation in this district in bad faith, a determination that ultimately led to a settlement with counsel in which counsel paid attorney's fees and costs and agreed to participate in a CLE that would include ethics training. *See In Re St. Stephen The Great LLC*, Bankruptcy Court Case No. 08-33689. A transcript of proceedings in that case is attached hereto as Exhibit 2 along with the order on approving the settlement with counsel. In the transcript, Judge Isgir states the Court's finding "that this [case] was filed in the utmost of bad faith from everything I've heard" and that "it was not filed for any legitimate purpose." *Id.* at 25.

16

Case 4:11-cv-00542 Document 17 Filed in TXSD on 02/23/11 Page 17 of 54

III.    **DISMISSAL IS THE APPROPRIATE REMEDY.**

When all of the claims asserted in a complaint are subject to arbitration, dismissal is the appropriate remedy. *See Heller v. Tesco Corp.,* H-09-0370, 2009 U.S. Dist. LEXIS 64007 (S.D. Tex. July 22, 2009) ("Here, because 'all issues raised in this action are arbitrable and must be submitted to arbitration, retaining jurisdiction and staying the action will serve no purpose.'" (quoting *Fedmet Corp. v. M/V VUYALYK,* 194 F.3d 674, 678 (5th Cir. 1999).)

That is the case here. All of the claims asserted by Plaintiffs against JIL and the other Defendants are subject to arbitration under the Agreement. Retaining jurisdiction over this matter would not serve any purpose. The Court should dismiss the Complaint.

IV.    **DEFENDANTS ARE ENTITLED TO AN AWARD OF THEIR FEES.**

Section 15.7 of the Agreement provides for an award of costs and expenses, including attorneys' fees, to any party required to seek judicial relief to enforce the Agreement's arbitration provision. Accordingly, Defendants ask the Court to order payment of their costs and expenses, including attorneys' fees, for pursuing this motion and any other appropriate relief. Upon entry of the Court's order, Defendants will submit itemized invoices reflecting these costs and expenses.

V.    **CONCLUSION**

Because the parties' Agreement requires all of the claims asserted in this action to be submitted to binding arbitration, Defendants ask the Court to dismiss the Complaint, award Defendants their costs and expenses, including attorneys' fees, for pursuing this motion, and all other just and proper relief.

Respectfully submitted,

THOMPSON & KNIGHT LLP


By     */s/ Jonathan B. Shoebotham*
          Jonathan B. Shoebotham
State Bar Number 18286800
333 Clay Street, Suite 3300
Houston, Texas 77002
(713) 654-8111 Telephone
(713) 654-1871 facsimile

Attorney In Charge for Defendants
Juridica Investments Limited, Juridica Capital
Management Limited and Juridicia Capital
Management (US) Inc.


Robert D. MacGill (#9989-49)
Mark J. Crandley (#22321-53)
Scott E. Murray (#26885-49)
Barnes & Thornburg LLP
11 South Meridian Street
Indianapolis, IN 46204
(317) 236-1313 Telephone
(317) 231-7433 Facsimile

Attorneys for Defendants Juridica Investments
Limited, Juridica Capital Management Limited and
Juridicia Capital Management (US) Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2011, I electronically filed the foregoing with the

clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to

the following:

> J. Mark Brewer
> Brewer Pritchard, PC
> Three Riverway, Suite 1800
> Houston, Texas 77056
> Phone: 713-209-2950
> Fax: 713-659-5302
> E-mail: brewer@bplaw.com

> /s/ Jonathan B. Shoebotham
> Jonathan B. Shoebotham

INDS02 1153513v1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON

S&T OIL EQUIPMENT & MACHINERY LTD., )
VALERIAN SIMIRICA, )
)
)
vs. )  Cause No. H-11-542
)
JURIDICA INVESTMENTS, LTD., )
JURIDICA CAPITAL MANAGEMENT LIMITED)
JURIDICA CAPITAL MANAGEMENT (US) INC.)

## DECLARATION OF PAUL SULLIVAN

1.  My name is Paul Sullivan.

2.  I am over 18 years old; I am competent to testify in this matter; and I have personal knowledge of the matters set forth below.

3.  I am the Senior Vice President for Juridica Capital Management (US) Inc. ("JCMUS"), one of the named defendants in the above action.  Since April 1, 2008, I have been a Member of the law firm of Fields Sullivan PLLC (originally called "Fields & Scrantom PLLC" and then "Fields Scranton Sullivan PLLC," and herein referred to as "FS").

4.  JIL is a limited company organized and existing under the laws of Guernsey, which is located in the Channel Islands about thirty (30) miles off the coast of France.  JIL's sole place of business is in Guernsey.  JIL maintains its only offices there; and its registered agent is located there.

5.  JIL provides strategic capital to the business community and the legal markets for corporate claims, otherwise referred to as "alternative litigation finance."  This market is an alternative to more traditional forms of financing litigation, including self-financing or financing through attorney contingency fees. JIL participates in one segment of this broader market, focusing exclusively on providing litigation financing to sophisticated businesses that are


EXHIBIT
1

involved in expensive, complex, high-risk commercial legal disputes.  JIL is a closed-ended investment company whose shares are listed on the AIM, an alternative market operated by the London Stock Exchange.  The overwhelming majority of JIL's shares are held by major British investment institutions.  JIL's only offices are in Guernsey, as is its registered agent.  JIL does not have any offices, officers or employees outside of Guernsey.

6.      JIL has an Investment Management Agreement with Juridica Capital Management Limited ("JCML"), a limited company organized and existing in Guernsey. JCML's sole place of business is in Guernsey.  JCMUS is a Delaware corporation (incorporated on November 14, 2008, more than five months after the execution of the Investment Agreement referred to below) that is an indirect wholly-owned subsidiary of JCML.  JCMUS engages in marketing activities and conducts due diligence on potential investments in the U.S. by JIL.

7.      I participated in the due diligence related to the negotiation of the Investment Agreement between JIL and the Plaintiffs in this action, Valerian Simirica and S&T Oil Equipment and Machinery Ltd. ("S&T Oil").

8.      Mr. Simirica informed me during this time that he had wide-ranging interests and that he had participated in a number of sophisticated business transactions.  Based on my conversations with him, I understand Mr. Simirica to be a sophisticated, international businessman.  Through S&T Oil, Simirica purchased a large, formerly state-owned industrial company in Romania that was privatized by the government of Romania in 2002.  The company – Nitramonia SA – converted natural gas into ammonia.

9.      JIL was approached in 2008 about the possibility of investing in an international arbitration filed by Simirica and S&T Oil against the government of Romania.

2

10. In connection with this potential investment, JIL received information from Global Arbitration Litigation Services Ltd. ("GALS"), a broker operating out of England and engaged by Plaintiffs and/or their representatives.

11. According to information provided by GALS to JIL, at one point, Nitramonia accounted for 20% of Romania's daily natural gas consumption.

12. In their international arbitration against Romania, Plaintiffs claim that, in 2007, the Romanian government terminated the privatization contract with Plaintiffs, seized the Nitramonia assets, and sold them for scrap value.

13. To challenge this action, Plaintiffs hired the international law firm of King & Spalding LLP to commence an arbitration against the government of Romania (the "Romanian Arbitration"). Plaintiffs filed the Romanian Arbitration in the International Center for the Settlement of Investment Disputes ("ICSID"), which is located in Washington D.C. Plaintiffs also filed an action in a Romanian court to challenge the seizure.

14. GALS approached JIL about investing in the Romanian Arbitration in 2008. Because the arbitration fell within the type of sophisticated, commercial cases in which JIL typically invests, after conducting due diligence, JIL agreed.

15. JIL and Plaintiffs subsequently negotiated and executed the Investment Agreement, which has been previously filed with the Court (the "Agreement"). Under that Agreement, JIL agreed to reimburse Plaintiffs' counsel for certain fees incurred to that date and to make certain funds available to cover the remaining costs of the Romanian Arbitration. JIL's total investment under the Agreement was to be in excess of $2.8 million.

16. The Agreement includes a mandatory arbitration provision that requires all disputes between the parties and other identified entities to be submitted to binding arbitration.

3

In fact, the very first page of the Agreement notified Plaintiffs of this fact. Only four pieces of information are contained on this page – the parties to the agreement, the date, a copyright notice, and the following sentence, in at least 14 point type: "THIS AGREEMENT IS SUBJECT TO BINDING ARBITRATION." The Agreement was submitted as Exhibit 2 to Mr. Simirica's affidavit in support of Plaintiffs' request for injunctive relief.

17.     Section 15.0 of the Investment Agreement then contains nine (9) separate paragraphs setting forth the scope and details of the arbitration provision. Specifically, Section 15.2 states that all disputes – regardless of the theory of liability – are subject to arbitration:

> Except as otherwise (but only to the extent) specified in Section 16 [which deals with foreclosing on security interests], all actions, disputes, claims and controversies under common law, statutory law or in equity of any type or nature whatsoever, whether arising before or after the date of this Agreement and whether directly or indirectly relating to: (a) this Agreement and/or any amendments and addenda hereto, or the breach, invalidity or termination hereof; (b) any previous or subsequent agreement between ASSIGNEE AND ASSIGNTORS; (c) any act committed by ASSIGNEE or by any parent company, subsidiary or affiliated company of ASSIGNEE (the "ASSIGNEE Companies"), or by any employee, agent, officer or director of an ASSIGNEE Company whether or not arising within the scope and course of employment or other contractual representation of the ASSIGNEE Companies (provided that such act arises under a relationship, transaction or dealing between ASSIGNEE and ASSIGNORS); (d) any act committed by ASSIGNORS or by any parent company, subsidiary or affiliated company of S&T (the "ASSIGNOR Companies"), or by any employee, agent, officer or director an of ASSIGNOR Company whether or not arising within the scope and course of employment or other contractual representation of ASSIGNOR Companies (provided that such act arises under a relationship, transaction or dealing between ASSIGNEE and ASSIGNORS); and/or (e) any other relationship, transaction or dealing between ASSIGNEE and ASSIGNOR (collectively the "Disputes"), will be subject to and resolved by binding arbitration.

18.     Section 15.3 provides that all arbitrations under the Agreement shall be conducted in accordance with the Rules of the London Court of International Arbitration (the "LCIA").

4

19.     Section 15.4 provides that the "seat and situs of the arbitration and of all oral arbitration hearings will be in St. Peter Port, Guernsey, Channel Island" – the site of JIL's sole place of business and the jurisdiction under whose laws JIL is organized.

20.     The Agreement also provides that it shall be governed by the laws of England and Wales.  (Agreement § 14.2.1.)

21.     Attached to the Agreement as Exhibit 4 is an opinion from Stuart Spiegel of the Law Offices of Spiegel and DeMars in Chicago, Illinois, dated May 23, 2008, to both S&T Oil and Simirica with respect to the enforceability of the arbitration provision.

22.     In the executed version of that written opinion, which is attached hereto as Exhibit1, Mr. Spiegel advised Plaintiffs that the Agreement was governed by the laws of England and Wales and that it contained a mandatory arbitration provision that would be enforced by state and federal courts in Plaintiffs' home jurisdiction, Illinois:

> In any action or proceeding arising out of or relating to the Investment Agreement in any court of the State of Illinois or in any federal court sitting in the State of Illinois, such court would recognize and give effect to the provisions of the Investment Agreement wherein the parties thereto agree that the Investment Agreement shall be governed by, and construed in accordance with, the laws of England and Wales and that all Disputes are governed by the mandatory arbitration provisions of Section 15.

23.     JIL paid more than $2.8 million in fees and costs under the Investment Agreement throughout 2008 and 2009.

24.     In late-2009, Plaintiffs' counsel in the Romanian Arbitration abruptly withdrew. In its follow-up investigation, JIL learned that Plaintiffs had made material misrepresentations and omissions during the time period leading up to execution of the Agreement.  JIL responded by filing an arbitration with the LCIA on December 23, 2010, alleging breach of the Agreement, fraud and related claims.

5

25.     Plaintiffs have thus far refused to respond to the pending arbitration in the LCIA. Instead, Plaintiffs filed this action on February 14, 2011.

26.     Plaintiffs' Complaint alleged claims against JIL, JCML and JCMUS. Plaintiffs purport to plead claims for RICO under 18 U.S.C. §1962; interference with a contractual relationship; fraud; conspiracy; aiding and abetting breach of fiduciary duty; declaratory judgment and an injunction.

27.     JIL is controlled and directed by a three-member board of directors. JIL's board consists of Lord Daniel Brennan, Q.C., a British citizen who lives in England; Richard D. Battey, a British citizen who lives in Guernsey; and J. Kermit Birchfield, an American citizen who lives in the United States. JIL's board of directors meets in-person on a quarterly basis. The vast majority of the board meetings have been conducted in-person in Guernsey.

28.     All contracts entered into by JIL are executed and delivered in Guernsey. JIL maintains its accounts in Guernsey; it holds its funds in banks located in Guernsey; it disburses funds used for its investments from Guernsey; and all proceeds JIL receives from its investments are remitted to bank accounts in Guernsey. Consistent with this general practice, the Investment Agreement at issue here was executed in Guernsey, and JIL wired the money to fund its investment from its accounts in Guernsey.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 2/23/11

Paul Sullivan

INDS02 1153676v1

EXHIBIT 4
TO
INVESTMENT AGREEMENT

May 23, 2008

Juridica Investments Limited
Bordeaux Court
Les Echelons, St. Peter Port
Guernsey GY1 6AW
Channel Islands

Gentlemen:

This opinion is furnished to you pursuant to Section 11.2.2 of the Investment Agreement, dated as of May 23, 2008 and the Schedules and Exhibits attached thereto (the "Investment Agreement"), between S&T Oil Equipment and Machinery Ltd., a corporation incorporated under the laws of the State of Illinois and having a place of business in the State of Illinois ("S&T"), and Mr. Valerian Simirica (the "Assignors"), and you, as "Assignee" named as such therein. Terms defined in the Investment Agreement are used herein as therein defined.

We have acted as counsel for the Assignors in connection with the preparation, execution and delivery of, and the investment made under, the Investment Agreement.

In that connection, we have examined:

(1) The Investment Agreement and the Exhibits attached thereto.
(2) The documents furnished by the Assignors pursuant to provisions of the Investment Agreement.
(3) The Articles and By-Laws of S&T (the "S&T Documents").
(4) The Certificate of the Secretary of State of Illinois, dated May 23, 2008, attesting to the continued corporate existence and good standing of S & T in that State.

We have also examined the originals, or copies certified to our satisfaction, of the documents listed in a certificate of the chief financial officer of S & T, dated the date hereof (the "Certificate"), certifying that the documents listed in such certificate are all of the indentures, loan or investment agreements, leases, guarantees, mortgages, security agreements, bonds, notes and



other agreements or instruments, and all of the orders, writs, judgments, awards, injunctions and decrees, which affect or purport to affect the Assignors' right to convey the Assigned Percentage to the Assignee or the Assignors' obligations under the Investment Agreement or the right of the Assignors to grant the security interest over the Collateral or to consummate the transactions contemplated by the Investment Agreement. In addition, we have examined the originals, or copies certified to our satisfaction, of such other corporate records of the Assignors, certificates of public officials and of officers of the Assignors, and agreements, instruments and other documents, as we have deemed necessary as a basis for the opinions expressed below. As to certain matters of fact material to such opinions, we have relied upon certificates of the Assignors or its officers or of public officials. We have not otherwise independently established the facts. We have assumed the due execution and delivery, pursuant to due authorization, of the Investment Agreement by the Assignee.

Our opinions are limited to the laws of the State of Illinois and the Federal laws of the United States and we do not express any opinion herein concerning any other law.

Based upon the foregoing and upon such investigation as we have deemed necessary, and subject to the qualifications set forth herein, we are of the following opinion:

1. S & T is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Illinois.

2. The execution, delivery and performance by S & T of the Investment Agreement is within its powers, have been duly authorized by all necessary action, and do not (i) result in any violation of the S & T Documents or (ii) result in any violation of any law, rule or regulation applicable to S & T or (iii) result in any violation of any contractual or legal restriction contained in any document listed in the Certificate or, breach or result in a default under, or result in the acceleration of (or entitle any party to accelerate) the maturity of any obligation of the Assignors under, or result in or require the creation of any lien upon or security interest in any property of the Assignors pursuant to the terms of, any agreement or instrument listed in the Certificate, or to the best or our knowledge, contained in any other similar document.

3. The Investment Agreement has been dully executed and delivered on behalf of the Assignors.

4. No authorization, approval or other action by, and no notice to or filing with, any governmental authority or regulatory body or any third party that is a party to any of the agreements and instruments listed in the Certificate is required for the due execution, delivery and performance by the Assignors of the Investment Agreement.

5. In any action or proceeding arising out of or relating to the Investment Agreement in any court of the State of Illinois or in any federal court sitting in the State of Illinois, such court would recognize and give effect to the provisions of the Investment Agreement wherein the parties thereto agree that the Investment Agreement shall be governed by, and construed in accordance with, the laws of England and Wales and that all Disputes are governed by the mandatory arbitration provisions of Section 15. Without limiting the generality of the foregoing, a court of the State of Illinois or a federal court sitting in the State of Illinois would apply the law of England and Wales in determining the enforceability of these provisions of the Investment Agreement, and

would not apply the laws of the State of Illinois, to determine or interpret these provisions of the Investment Agreement.

Both U.S. federal arbitration law and international arbitration treaties recognize the importance of party autonomy. U.S. courts must enforce arbitration agreements in accordance with the terms of the contract, and the law specified by the parties. Federal and State courts have generally upheld the enforceability of choice of law clauses, although these courts have differed on whether the law chosen by the parties governs both the substantive obligations between the parties and the procedural rules of arbitration.

However, if a court were to hold that the Investment Agreement is governed by the laws of the State of Illinois, to the extent that it reflects a party's unequivocal intent to do so, U.S. courts will wholly enforce a choice of law clause within a valid arbitration agreement, pertaining to both the substantive and procedural elements of an arbitration. Moreover, in international disputes, the Supreme Court has articulated an even stronger reason for U.S. courts to enforce arbitration agreements as written . In both domestic and international arbitration, only when there is ambiguity surrounding the proper application of the chosen law will a U.S. court stray from the parties express choice to resolve the parties' dispute and agree that the Investment Agreement might be, under the law of the State of Illinois, a legal, valid and binding obligation of the Assignors enforceable against the Assignors in accordance with its terms.

6. After thorough investigation, my office has identified the following liabilities which might have a materially adverse effect upon the financial condition of Mr. Valerian Simirica.:

    a) Mortgage foreclosure complaint filed on May 13, 2008, against one of the Assignors, Mr. Valerian Simirica, identified as Case No:08-CH-17515 pending in the Illinois Circuit Court of Cook County with a potential liability of the said Assignor for an amount of U.S. $957,536.53;

    b) Outstanding Judgment entered against Defendant, Mr. Valerian Simirica by the Illinois Circuit Court of Cook Count in Case No: 06-M1-146471, for an amount of U.S.$9,822.45. No actions have been taken by the Plaintiff to collect on this Judgment

    c) Contract complaint filed on February 15, 2008, against Mr. Valerian Simirica identified as Case No: 08-M1-112039, pending in the Illinois Circuit Court of Cook County with a potential liability of the said Assignor for an amount of U.S. $9,121.16;

The above cases are only referring to Assignor, Mr. Valerian Simirica and not to Assignor, S&T Oil and Equipment, LTD.

To the best of our knowledge, except for the cases mentioned above, there are no other pending or overtly threatened actions or proceedings against the Assignors before any court, governmental agency or arbitrator which purport to affect the legality, validity, binding effect or enforceability of the Investment Agreement or which are likely to have a materially adverse effect upon the financial condition or operations of the Assignors.

Our opinion in paragraph 5 above is subject to the effect of (i) any applicable bankruptcy, insolvency, reorganization, moratorium or similar law affecting creditors' rights generally, and (ii) general principles of equity, including (without limitation) concepts of materiality, reasonableness, good faith and fair dealing (regardless of whether considered in a proceeding in equity or at law).

Very truly yours,

Stuart Spiegel

Law Offices Of Spiegel & DeMars
100 W. Monroe, Suite 910
Chicago, IL 60603
Phone: 312/726-3377
Fax: 312/782-3366

Case 4:11-cv-00542   Document 20   Filed in TXSD on 02/23/11   Page 31 of 58
Case 4:11-cv-00542   Document 17   Filed in TXSD on 02/23/11   Page 27 of 54
Case 08-33689   Document 41   Filed in TXSB on 10/29/08   Page 1 of 2



**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
10/29/2008

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. |
| ST STEPHEN THE GREAT, LLC | § | 08-33689-H1-7 |
| | § | Chapter 7 |
| | § | |
| DEBTOR | § | |

**ORDER GRANTING TRUSTEE'S
MOTION TO COMPROMISE CONTROVERSY**

CAME ON FOR CONSIDERATION, the Trustee's Motion to Compromise Controversy and it appearing that the Motion to Compromise Controversy has merit and should be granted; it is therefore

ORDERED that the Motion to Compromise be, and hereby is GRANTED; it is further,

ORDERED that J. Mark Brewer and the firm of Brewer & Pritchard, P.C. shall pay Randy W. Williams a total of $5,000 for costs incurred in this case, to be delivered to Randy W. Williams, Thompson & Knight LLP, 333 Clay St., Suite 3300, Houston, TX 77002 on or before the expiration of ten (10) days of entry of this order; it is further,

ORDERED that J. Mark Brewer and the firm of Brewer & Pritchard, P.C. shall pay Thompson & Knight LLP a total of $5,000 for attorney fees and costs provided to the Trustee in this case to be delivered to Randy W. Williams, Thompson & Knight LLP, 333 Clay St., Suite 3300, Houston, TX 77002 on or before the expiration of ten (10) days of entry of this order; it is further,

502306 000009 HOUSTON 613441.1


EXHIBIT
2

Case 4:11-cv-00542   Document 20   Filed in TXSD on 02/23/11   Page 32 of 58
Case 4:11-cv-00542   Document 17   Filed in TXSD on 02/23/11   Page 28 of 54
Case 08-33689   Document 41   Filed in TXSB on 10/29/08   Page 2 of 2

ORDERED that J. Mark Brewer and the firm of Brewer & Pritchard, P.C. shall pay the sum of $325 to the U.S. Trustee for outstanding and unpaid fees in this case to be delivered to the United States Trustee, c/o Nancy Holley, 515 Rusk Avenue, 3rd Floor, Houston, TX 77002 on or before the expiration of ten (10) days of entry of this order; it is further,

ORDERED that J. Mark Brewer and the firm of Brewer & Pritchard, P.C. shall pay the sum of $5,000 to the Clerk of Court for the U.S. Bankruptcy Court to be delivered to Michael N. Milby, Clerk of Court, 515 Rusk Avenue, Houston, TX 77002 on or before the expiration of ten (10) days of entry of this order; it is further,

ORDERED that J. Mark Brewer shall complete a minimum of ten (10) hours of Continuing Legal Education ("CLE") in a course on bankruptcy law approved by the State Bar of Texas on or before six (6) months from entry of an order approving the compromise and file a sworn notice of completion in this case within ten (10) days from completion; and it is further,

ORDERED that any such CLE shall contain a minimum of two (2) hours of CLE approved for ethics.

DATED: _10/27/08_____

_____
UNITED STATES BANKRUPTCY JUDGE

Case 4:11-cv-00542 Document 20 Filed in TXSD on 02/23/11 Page 33 of 58
Case 4:11-cv-00542 Document 17 Filed in TXSD on 02/23/11 Page 29 of 54
Case 08-33689 Document 48 Filed in TXSB on 04/21/09 Page 1 of 26

1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | | |
|---|---|---|---|
| IN RE: | § | CASE NO. 08-33689-H1-7 | |
| | § | | |
| | § | | |
| ST STEPHHEN THE GREAT, LLC | § | HOUSTON, TEXAS | |
| | § | AUGUST 28, 2008 | |
| DEBTOR | § | 11:03 A.M. TO 1:38 P.M. | |

MOTION TO DISMISS

BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

FOR DEBTOR:                    SEE NEXT PAGE

FOR CREDITORS:                 SEE NEXT PAGE

COURT RECORDER:                EBONEE SPENCER

PREPARED BY:

JUDICIAL TRANSCRIBERS OF TEXAS, INC.
P.O. Box 925675
Houston, Texas 77292-5675
Tel: 713-697-4718 ▼ Fax: 713-697-4722
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

JUDICIAL TRANSCRIBERS OF TEXAS, INC.

Case 4:11-cv-00542  Document 20  Filed in TXSD on 02/23/11  Page 34 of 58
Case 4:11-cv-00542  Document 17  Filed in TXSD on 02/23/11  Page 30 of 54
Case 08-33689  Document 48  Filed in TXSB on 04/21/09  Page 2 of 26

2

```
 1                         APPEARANCES:

 2

 3   FOR THE DEBTOR:              MR. J. MARK BREWER
                                  BREWER PRITCHARD, PC
 4                                THREE RIVERWAY, SUITE 1800
                                  HOUSTON, TEXAS 77056
 5                                (713) 209-2950

 6

 7   FOR U.S. TRUSTEE:           MS. ELLEN HICKMAN
                                 OFFICE OF U.S. TRUSTEE
 8                               515 RUSK STREET, SUITE 3516
                                 HOUSTON, TEXAS 77002
 9                               (713) 718-4650

10                                    AND

11                               MR. RANDY W. WILLIAMS, TRUSTEE
                                 THOMPSON & KNIGHT, LLP
12                               333 CLAY, SUITE 3300
                                 HOUSTON, TEXAS 77002
13                               (713) 654-8111

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 4:11-cv-00542   Document 20   Filed in TXSD on 02/23/11   Page 35 of 58
Case 4:11-cv-00542   Document 17   Filed in TXSD on 02/23/11   Page 31 of 54
Case 08-33689   Document 48   Filed in TXSB on 04/21/09   Page 3 of 26

3

1        HOUSTON, TEXAS; AUGUST 28, 2008; 11:02:40 A.M.

2            THE COURT:  Please be seated.

3                Okay, *St Stephen the Great, LLC,* it is 08-

4    33689.

5                I saw Mr. Williams here earlier today.  Let's

6    go ahead and make appearances and we'll get started.  Go

7    ahead.

8            MR. BREWER:  Morning, Your Honor.

9            THE COURT:  Morning, Mr. Brewer.

10           MS. HICKMAN:  Your Honor, Ellen Hickman on behalf

11   of the U.S. Trustee, although I did not intend to make an

12   appearance, just to observe the hearing.

13           THE COURT:  Thank you.  Why don't you just have a

14   seat?  Here's Mr. Williams walking in now.

15               Mr. Williams, that will teach you to show up

16   early.  Go ahead and make your appearance for the court

17   reporter, Mr. Williams.

18           MR. WILLIAMS:  Randy Williams, W-i-l-l-i-a-m-s.

19   I'm the Chapter 7 Trustee in the St. Stephen the Great, LLC

20   case.

21           THE COURT:  All right, this is a motion to dismiss

22   the case altogether on the Trustee's motion.  I'm going to

23   find that service has now been made on all participants in

24   accordance with the Bankruptcy Rules.  All creditors have

25   received notice.  I have received no objections.

JUDICIAL TRANSCRIBERS OF TEXAS, INC.

Case 4:11-cv-00542   Document 20   Filed in TXSD on 02/23/11   Page 36 of 58
Case 4:11-cv-00542   Document 17   Filed in TXSD on 02/23/11   Page 32 of 54
Case 08-33689   Document 48   Filed in TXSB on 04/21/09   Page 4 of 26

4

1          Mr. Williams, why don't you go ahead?

2          **MR. WILLIAMS:**  Yes, Your Honor.  I filed my motion

3    to dismiss because after I was appointed this Chapter 7

4    Trustee in the case and began my investigation into what the

5    business of the debtor was, who the debtor was and what was

6    going on, it became apparent that what was filed with the

7    Court, at least, based on the information that I've been

8    able to obtain from various sources, including Mr. Brewer is

9    that it's incorrect.  And frankly, Your Honor, I'm not even

10   sure that a case has actually ever been filed.

11          First, there is no entity registered in

12   either the U.K. or the U.S. that goes by the name of St

13   Stephen the Great, LLC.  There is a St Stephen the Great,

14   Limited, which is a U.K. registered company, but it is a

15   limited co.  They don't have the same limited liability

16   company designation like we would have here in the State of

17   Texas.

18          Mr. Brewer's explanation to me in an email

19   was that that was under advice of a solicitor that they

20   could use that name.  But, he did confirm to me that no DBA

21   had ever been filed, for example, in Harris County or

22   anywhere in the U.K.

23          In addition, Your Honor, what is given under

24   the request for social security or EIN number, the 119839

25   number is not the number for the St Stephen the Great, no

JUDICIAL TRANSCRIBERS OF TEXAS, INC.

Case 4:11-cv-00542 Document 20 Filed in TXSD on 02/23/11 Page 37 of 58
Case 4:11-cv-00542 Document 17 Filed in TXSD on 02/23/11 Page 33 of 54
Case 08-33689 Document 48 Filed in TXSB on 04/21/09 Page 5 of 26

5

```
1   [sp.ph.] co.  Its company number, according to documents
2   that I got from parties in the U.K., is 06110519.  It turns
3   out that the 119839 number is the number of the registered
4   charity, St Stephens Charitable Trust, which in the course
5   of reviewing information related to this case, I came across
6   a notice, a copy of a notice that was sent out under -- it
7   says it was sent out.  It was not signed, but sent out by
8   Philip Brewer, who is the president of the Orthodox Church
9   Mission Fund, but also listed as the president of the debtor
10  in this case, that St Stephen the Great Company had under a
11  contract with St Stephen the Great Charitable Trust in
12  managing the various book stores in the U.K. and that that
13  arrangement had been terminated effective June 1, 2008, and
14  that management responsibility for the former, and they
15  called them SPCK shops, would be vested in another party,
16  and that party would be ENC Management Company, which I
17  believe, although I've not been able to confirm this, is an
18  entity that the Brewer's either created or controlled.
19              I don't believe, from information I've been
20  provided from creditors, that all the book stores are still
21  operating, although I do believe some of them may still be
22  operating.  But -- So, given -- Those were two issues just
23  off the front page of the petition where I don't think we
24  have a correct debtor name, we clearly don't have an
25  appropriate number for the debtor that it is allegedly being
```

1    filed for.  And my copy of the Docket Number 1, the original

2    voluntary petition is only signed by Mark Brewer as attorney

3    for the debtor.  It is not signed by a representative of the

4    company.  And then when I reviewed the schedules and

5    statements in the case and those are filed in the case.

6    When you go to the signature pages for the various entities,

7    for example, on the last page of the statement of financial

8    affairs, it's dated June 19th, 2008, it's purportedly signed

9    by a J. Mark Brewer, Chairman, but it is signed by

10   permission of some other party with initials, which again, I

11   think this goes to whether we even have -- the case was even

12   properly filed in the first place.

13          I believe it also filed on Docket 23, it was

14   addressed to the Clerk in the Court and signed by "Yours

15   Sincerely, Outrageous."  It also identifies the problem that

16   I came across with the registration number, the EIN number

17   being incorrect, and that's the Charity number, not the

18   number for this purported debtor.

19          And in connection with various employment

20   tribunal proceedings related to employees who are either

21   dismissed or have claims against the debtor, I was sent a

22   filing in Case No. 1500898/2008/D.  It is styled Vendy and

23   Others, and that's *Vendy versus St Stephen the Great, LLC,*

24   *St Stephen the Great Charitable Trust and ENC Management*

25   *Company* as respondents.  And this appears to be an

Case 4:11-cv-00542  Document 20  Filed in TXSD on 02/23/11  Page 39 of 58
Case 4:11-cv-00542  Document 17  Filed in TXSD on 02/23/11  Page 35 of 54
Case 08-33689  Document 48  Filed in TXSB on 04/21/09  Page 7 of 26

7

1    informational filing.  It says amendment to grounds of

2    claim.

3              Under Paragraph 3 in this document, it says,

4    "It became apparent at the time that the LLC suffix was an

5    American term being used by the Brewer brothers to describe

6    the identity of the claimant's employer.  No evidence has

7    yet emerged of any U.S. registered company of this name.

8    And the only relevant limited company U.S. DAW has been able

9    to identify is that of St Stephen the Great Limited,

10   registered in England at Company's House under Company

11   Number 06110519.  And I bring that to the Court's attention

12   because that's simply the lawyers for these claimants in

13   this proceeding confirming the information that I've related

14   to the Court that I've been able to pull together about this

15   case.

16             And Your Honor, if I could, I've received on

17   July 15th, 2008 from a Michael Wykes, W-y-k-e-s, Creditor

18   Services for Moore Stephens, M-o-o-r-e S-t-e-h-e-n-s

19   Chartered Accountants, a claim filed for Oxford University

20   Press.  Attached to that are their statement of account,

21   which -- I bring this to Court's attention is because the

22   party that they identifies the party to whom they were doing

23   business and sent the invoices to is listed as SPCK

24   Bookshops at a London address.  And at least from the

25   information that they're providing in this part of their

JUDICIAL TRANSCRIBERS OF TEXAS, INC.

Case 4:11-cv-00542   Document 20   Filed in TXSD on 02/23/11   Page 40 of 58
Case 4:11-cv-00542   Document 17   Filed in TXSD on 02/23/11   Page 36 of 54
Case 08-33689   Document 48   Filed in TXSB on 04/21/09   Page 8 of 26

8

1   claim, again this SPCK name comes up, which isn't even the

2   name that appears in connection with this case.

3                    I also noted that on the petition, Your

4   Honor, the debtor is listed as a tax exempt organization

5   under the Internal Revenue Code.  Since this entity is a

6   foreign entity and does not appear to be registered as a

7   charity, but as a company, I'm not sure the basis for that

8   to have been checked.  Further again, since there's no --

9   I'm aware of, there's no EIN related to these names.

10                   In addition, it is clear from the creditors

11  that have corresponded with me and that have made various

12  findings with the Court that there was an entity similar to

13  this name that apparently was conducting business in England

14  and Wales running book shops.  But, when you look at the

15  schedules that are filed in the case, no asset is listed on

16  Schedule A or B, and in fact, we don't have in the schedules

17  or statements this relationship described where -- that is

18  referred to in the notice that was sent out to the employees

19  of the one book shop, but there was some kind of contractual

20  relationship by which they were running the book shops.

21                   However, even we have no assets listed on

22  Schedule A or B, the petition block was check that estimated

23  assets were $100,001 to $500,000.  When I asked Mr. Brewer,

24  you know, to explain this discrepancy he then referred to

25  the fact that while there was a web-related business, which

Case 4:11-cv-00542   Document 20   Filed in TXSD on 02/23/11   Page 41 of 58
Case 4:11-cv-00542   Document 17   Filed in TXSD on 02/23/11   Page 37 of 54
Case 08-33689   Document 48   Filed in TXSB on 04/21/09   Page 9 of 26

9

1   was not disclosed in the schedules and statements that might

2   be of some value.  And I asked him why that was not listed

3   on the schedules and never received an explanation for that.

4            I also found it unusual and inconsistent that

5   Mr. Brewer said that he was accepting as a retainer to act

6   as counsel in this case, $75,000, even though he's an

7   interested party and insider, and even though he's not

8   actually been paid anything.

9            The statement of financial affairs that are

10  filed in the case do list millions of dollars in business

11  related to whatever this business was over the last few

12  years.  But again, then we get back to there being no assets

13  scheduled, and as well no bank account scheduled for this

14  entity.  And I believe that the lease that was identified on

15  Schedule G was the lease for an office for the business of

16  the debtor.  We don't have one lease listed for all these

17  book store operations that were there in England.  And I

18  believe that that may be the cause that those leases were

19  actually with St Stephens, the Great Charitable Trust

20  Entity, although, I don't have any -- I've not received any

21  direct evidence of that.

22            In addition to those problems, Your Honor,

23  there's a practical fact that, to the extent there is a St

24  Stephens the Great Limited, it's a U.K. company.  It had

25  offices in the U.K.  It operated businesses in the U.K. in

Case 4:11-cv-00542   Document 20   Filed in TXSD on 02/23/11   Page 42 of 58
Case 4:11-cv-00542   Document 17   Filed in TXSD on 02/23/11   Page 38 of 54
Case 08-33689   Document 48   Filed in TXSB on 04/21/09   Page 10 of 26

10

1    relation apparently with a sister company that's also a U.K.

2    company.   There is at least the one case these employment

3    tribunal claims process that's ongoing over there -- ongoing

4    over there, which not only is against purportedly this

5    entity but those other two entity -- well, the other St

6    Stephen the Great Trust Entity and Mr. Brewer, individually.

7                Various creditors want to make claims over

8    there where they do still believe there is still a book shop

9    operating.   And given that there's no assets in this case, I

10   don't have the funds to take off over there and begin to

11   explore all these different entities and figure out what to

12   do with this.   And if there are going to be insolvency

13   proceedings, it makes no sense that they would be instituted

14   by creditors over there, ultimately, if that's the course

15   that they chose to pursue in terms of unwinding what the

16   relationship of this was or whether in fact this entity was

17   a mere front piece for the true owner of the businesses, the

18   charitable trust, which is another entity.

19               So, those are the bases I have, Your Honor,

20   for filing my motion.   I understand that I upset Mr. Brewer

21   by the fact that in addition in my motion to dismiss I also

22   designated that, to the extent that I believe that

23   information had been filed which was inaccurate and wrong

24   and was known to have been wrong at the time that it was

25   filed, that I had forwarded this information to the U.S.


                    JUDICIAL TRANSCRIBERS OF TEXAS, INC.

Case 4:11-cv-00542   Document 20   Filed in TXSD on 02/23/11   Page 43 of 58
Case 4:11-cv-00542   Document 17   Filed in TXSD on 02/23/11   Page 39 of 54
Case 08-33689   Document 48   Filed in TXSB on 04/21/09   Page 11 of 26

11

1   Trustee as I'm required to do, for them to conduct whatever

2   investigation they felt necessary related to this and to

3   also, if possible, refer this to law enforcement in the

4   United Kingdom, since gain these entities, these business

5   are all U.K. related.

6            Since there's no opposition to my motion, I

7   can represent to the Court that every creditor to this case

8   whose contacted me from the U.K. has asked that the motion

9   be dismissed.  Your Honor may recall at the time the case

10  was converted, there were a few parties back then urging

11  that the case be dismissed.  What I hear from the people

12  enough to contact me, they want to proceed with their claims

13  over there as opposed to attempting to do through -- do so

14  through a bankruptcy case in Houston, Texas.  And I agree

15  that I believe that that's the proper way for this to go

16  forward, especially when I don't think we have a case

17  actually properly filed to give this Court jurisdiction over

18  the appropriate debtor and its assets to the extent it has

19  any.

20            **THE COURT:**  Thank you.  Mr. Brewer?

21            **MR. BREWER:**  Thank you, Your Honor.

22            It is most unfortunate that Mr. Williams,

23  from the very moment that he took on the trustee role,

24  refused to speak to me at any time, and devoted all his

25  energies to trying to find out a way to get the case

Case 4:11-cv-00542   Document 20   Filed in TXSD on 02/23/11   Page 44 of 58
Case 4:11-cv-00542   Document 17   Filed in TXSD on 02/23/11   Page 40 of 54
Case 08-33689   Document 48   Filed in TXSB on 04/21/09   Page 12 of 26

12

1   dismissed, as he's just laid out for you.

2            It's interesting to note that all of what

3   he's just said, we've not heard anything that the man has

4   done as the trustee to try to do what's in the best interest

5   of the debtor.  And I need -- I need to clarify a number of

6   things that he said.  Now, I realize that a lot of things

7   that I'm about to say, I told Your Honor two months ago.

8   And if Mr. Williams had been here, he would know that, of

9   course.  But, just to -- just to reiterate them at this

10  time.  First of all, he states that in the United Kingdom,

11  the debtor is known as SSG Limited.  That's not correct.

12  The name of the company as I believe I stated two months ago

13  is St Stephen the Great.  That's the name.  The LLC

14  describes what it is, just as limited does.  It's also

15  incorrect that in the United Kingdom, there's no such thing

16  as a limited liability company.  There are such things as

17  limited liability companies.

18            It is true that they don't tend to refer to

19  them as LLC's like we do.  I mean, this is -- if you'll

20  pardon me, Judge, this is really trying to cut a pretty fine

21  line that has no purpose.  There's no misrepresentation of

22  who or what the debtor is.  He specifically asked me about

23  the numbers that were put on the petition, and there are two

24  numbers.  One of them is the equivalent of an EIN.  It's the

25  Charities Tax Exempt number.  They don't call it tax exempt;

Case 4:11-cv-00542  Document 20  Filed in TXSD on 02/23/11  Page 45 of 58
Case 4:11-cv-00542  Document 17  Filed in TXSD on 02/23/11  Page 41 of 54
Case 08-33689  Document 48  Filed in TXSB on 04/21/09  Page 13 of 26

13

1    they call it a charity registration number.  That's because

2    they have a charity commission.  We don't have such a thing.

3             If you go online, as I'm sure Mr. Williams

4    has done, and you simply plug in that number on a Google.co-

5    search, it's going to bring up this charity.  And the

6    official page for this -- pardon me, for this charity at the

7    charity commission's website.

8             The other number is a company-house

9    registration number, which is probably the closest thing

10   that we have to that is the Texas Controller or Secretary of

11   State in most other states where a company files for

12   authorization to do business and they're given a certificate

13   number.  We get that in Texas too.  It's just that in Texas,

14   and in most other states, we don't tend to ever use that

15   number, but it's on the certificate.

16            Now, in the U.K. on the other hand, they do

17   use that number and they have a third number, and I think I

18   went all over -- over all of this before, but the third

19   number that they use, which we really don't have any

20   equivalent to, is a VAT number, Valued Added Tax.

21   Virtually, every non-individual in the United Kingdom has a

22   VAT, if especially they're engaged in any sort of what they

23   call a trading operation where they're either buying or

24   selling stuff.  That's the way their tax system works.  St

25   Stephen the Great does have a VAT number.  I can't recall it

Case 4:11-cv-00542   Document 20   Filed in TXSD on 02/23/11   Page 46 of 58
Case 4:11-cv-00542   Document 17   Filed in TXSD on 02/23/11   Page 42 of 54
Case 08-33689   Document 48   Filed in TXSB on 04/21/09   Page 14 of 26

14

1    for you by heart, and I can't recall if it is specifically

2    called out on the bankruptcy, the petition that was

3    originally filed.   There's probably no reason why it should

4    have been.

5                   As far as whether this is a United States tax

6    exempt entity, I suppose that's a matter of opinion, but

7    under the rules affecting 501c3's, I think it's well-known

8    that a tax exempt entity has 18 months after its inception

9    to apply for tax exempt status, and then it's retroactive.

10   And I think it's also possible to file an application even

11   later than that, but there is no U.S. tax I.D., tax exempt

12   number -- excuse me, that's not stated correctly.   There's

13   no tax exempt letter from the United States IRS for this

14   debtor, nor would there have needed to have been because it

15   is not a U.S. company, as we all know.

16                  It is, of course, the equivalent of tax

17   exempt in the United Kingdom.   Now, ever since the entity

18   was formed, which was in February of last year, the company

19   has identified itself as St Stephen the Great, LLC.   The

20   reason for that is, as I think Your Honor will recall, the

21   charity commission instructed the trustees, of which I am

22   one, of St Stephen the Great Charitable Trust to form a

23   limited company so that it could conduct the book shop

24   retail business under that legal umbrella.   So the company

25   was formed in either late January or early February.   And in

Case 4:11-cv-00542  Document 20   Filed in TXSD on 02/23/11   Page 47 of 58
Case 4:11-cv-00542   Document 17   Filed in TXSD on 02/23/11   Page 43 of 54
Case 08-33689   Document 48   Filed in TXSB on 04/21/09   Page 15 of 26

15

1  roughly mid-June of last year, the charity commission issued

2  a formal registration to that entity.

3              At that time it changed the registration, the

4  charity registration number, of St Stephen the Great

5  Charitable Trust to having identical number with the

6  Charity, St Stephen the Great, LLC or the debtor in this

7  case.

8              The only difference between the two is that

9  the Charitable Trust was given the -1 number, so if you look

10  at the original filing and you see, I think its 119839 or

11  something like that.  The Charitable Trust has the identical

12  number with the addition of -1 at the end, because they are

13  considered to be related charities, obviously.  The

14  difference being that the Charitable -- excuse me, the

15  trading company, the debtor in this case is the entity that

16  conducts the trading business or did until June of this year

17  for the Charitable Trust.

18              The common about leases, if I could touch on

19  that, I believe that I also explained this at the hearing we

20  had two months ago, but when the Society for Promoting

21  Christian Knowledge, SPCK for short, transferred the

22  business of these book shops to the St Stephen the Great

23  Charitable Trust.  That occurred effective November 1st of

24  2006.  There's a transfer document dated October 19th, 2006.

25  When it transferred that business, it transferred the assets

Case 4:11-cv-00542   Document 20   Filed in TXSD on 02/23/11   Page 48 of 58
Case 4:11-cv-00542   Document 17   Filed in TXSD on 02/23/11   Page 44 of 54
Case 08-33689   Document 48   Filed in TXSB on 04/21/09   Page 16 of 26

16

1  and liabilities having to do with the 23 book shops into

2  this Charitable Trust.  Those included 11 different

3  properties, which were either transferred in a free-hold or

4  subject to a peppercorn for a seven-year period.  So, for

5  all intents and purposes are not only rent-free, but they

6  are owned by the Charitable Trust.

7          Additionally, there were another 11

8  properties which were subject to some kind of a commercial

9  lease of one kind or another.  And those also were

10 transferred to the Charitable Trust.

11         The final piece of property was property in

12 the City of Bristol.  And that was transferred originally as

13 a part of a free-hold but SPCK had retained the right to

14 sell it, which they then did in early -- I think March of

15 last year.  Consequently, the Charitable Trust negotiated

16 for a new lease a few doors down.  By the time the lease

17 came into fruition, it was executed by St Stephen the Great,

18 the Limited company that's the debtor in this case.

19         So, as of the time of the filing of this

20 case, the only lease that had ever been a liability of this

21 debtor was the property in Bristol.  It never leased any of

22 the other properties.  Now, if I could just go back to what

23 the Charity Commission said.  The Charity Commission said

24 they did not want --

25         THE COURT:  What is EMC?


                    JUDICIAL TRANSCRIBERS OF TEXAS, INC.

Case 4:11-cv-00542 Document 20 Filed in TXSD on 02/23/11 Page 49 of 58
Case 4:11-cv-00542 Document 17 Filed in TXSD on 02/23/11 Page 45 of 54
Case 08-33689 Document 48 Filed in TXSB on 04/21/09 Page 17 of 26

17

1          MR. BREWER:  What?

2          THE COURT:  What is EMC?

3          MR. BREWER:  EMC is a management company that was

4   incorporated by myself in Texas to conduct the ongoing

5   operations of the book shops in a few of these locations,

6   following the filing insolvency of the limited liability

7   company.

8          THE COURT:  This is the first I think I've heard

9   of that, right?  Did you describe that at the last --

10         MR. BREWER:  I don't remember if we did or not.

11         THE COURT:  Well, why didn't this entity that was

12   going to file Chapter 11 continue the management?

13         MR. BREWER:  Because --

14         THE COURT:  Why wouldn't you transfer it to one of

15   your own companies?

16         MR. BREWER:  Because -- Because the Charity

17   Commission would not permit to do so.

18         THE COURT:  Would not permit who to do what?

19         MR. BREWER:  It will not permit the Charitable

20   Trust to conduct any trading operations whatsoever.

21   That's --

22         THE COURT:  Not the Charitable Trust.

23         MR. BREWER:  -- the reason why --

24         THE COURT:  Why is the LLC transferring all of its

25   management rights to one of your other companies rather than

JUDICIAL TRANSCRIBERS OF TEXAS, INC.

Case 4:11-cv-00542 Document 20 Filed in TXSD on 02/23/11 Page 50 of 58
Case 4:11-cv-00542 Document 17 Filed in TXSD on 02/23/11 Page 46 of 54
Case 08-33689 Document 48 Filed in TXSB on 04/21/09 Page 18 of 26

18

1  trying to stay in business?

2          MR. BREWER:  It didn't transfer them to -- It's

3  not the debtor that transferred, Your Honor.  Those

4  rights --

5          THE COURT:  Well, you control both entities.

6          MR. BREWER:  Right.

7          THE COURT:  You terminated the LLC's rights to

8  earn money from the management agreement, leaving all those

9  creditors holding the bag, and you gave the management

10 rights to one of your own companies.  Why did that happen?

11         MR. BREWER:  Well, first of all, Judge, it's not

12 my own company.  It's another charitable company.  It's a

13 tax exempt, tax free company.  It's not a for profit

14 venture.

15         THE COURT:  Why did you transfer all the

16 management rights from the LLC over to a new company and

17 leave the creditors of the old company holding the bag?

18         MR. BREWER:  Judge, what we did was try to move

19 the business into independent management structure.  And we

20 have succeeded in doing that.  That was really part of the

21 reorganization idea that I had was that we would transfer

22 these trading operations to parties -- generally the parties

23 that had been managing the stores previously as far back

24 as --

25         THE COURT:  And why did you do that and leaving

JUDICIAL TRANSCRIBERS OF TEXAS, INC.

Case 4:11-cv-00542  Document 20   Filed in TXSD on 02/23/11   Page 51 of 58
Case 4:11-cv-00542   Document 17    Filed in TXSD on 02/23/11   Page 47 of 54
Case 08-33689   Document 48   Filed in TXSB on 04/21/09   Page 19 of 26

19

1   all the creditors of this entity holding the bag?

2        MR. BREWER:  We haven't left them holding the bag,

3   Judge.  We've been --

4        THE COURT:  How are they going to get paid?

5        MR. BREWER:  We've been working on pay-outs with

6   all of them, especially since Mr. Williams' initial salvo to

7   me that, you know, hey, this is a fraud and blah, blah,

8   blah.  And so --

9        THE COURT:  Well, if you took all the revenue

10  sources out of this company and put them into another

11  company, both of which you manage, it seems to me the

12  creditors of the one you took all the revenue sources out of

13  are going to have a pretty hard time getting paid.

14       MR. BREWER:  Except for the fact, Judge, that

15  there isn't any net revenue.  These companies, these book

16  shops are loss-making ventures.  They're not --

17       THE COURT:  Then why did you put it in a new

18  company?

19       MR. BREWER:  Because that was the only way we

20  could do it.

21       THE COURT:  Why didn't you leave it in the old

22  company?

23       MR. BREWER:  Because, Judge, it was insolvent.

24  And under charity law in the U.K., you're not allowed to

25  continue to operate the company when you're insolvent.  It's

JUDICIAL TRANSCRIBERS OF TEXAS, INC.

Case 4:11-cv-00542   Document 20   Filed in TXSD on 02/23/11   Page 52 of 58
Case 4:11-cv-00542   Document 17   Filed in TXSD on 02/23/11   Page 48 of 54
Case 08-33689   Document 48   Filed in TXSB on 04/21/09   Page 20 of 26

20

1  a violation of their law.  We did not have any choice but to

2  put that company into either a U.K. insolvency or American

3  bankruptcy.

4       THE COURT:  And why it better in an American

5  bankruptcy than a U.K. insolvency where they can decide if

6  you're right about that?

7       MR. BREWER:  As I said when you asked me that two

8  months ago, it's because it's considerably cheaper here.

9  Attorney's fees, for example, are less than half what they

10  are in the U.K.  The fees alone are significantly less.  And

11  all of these creditors have always dealt with the company

12  here in Houston.

13       THE COURT:  Why did you --

14       MR. BREWER:  That's where all the administration

15  has always been.

16       THE COURT:  Why file bankruptcy at all?

17       MR. BREWER:  They've all filed -- They --

18       THE COURT:  Why file bankruptcy at all?

19       MR. BREWER:  To prevent from being sued, the same

20  reason any debtor would.

21       THE COURT:  Well, why -- Who cares if the debtor

22  gets sued? It has no assets.

23       MR. BREWER:  Well, Judge, in due respect, I don't

24  think that's a very good way to go about it, to just let

25  them file suits and take judgments.  Besides which, as he


JUDICIAL TRANSCRIBERS OF TEXAS, INC.

1   pointed out, these employees, for example, have also brought

2   claims against the Charitable Trust, which didn't even

3   employ them.  So --

4          THE COURT:  Well, that's the Charitable Trust

5   problem.

6          MR. BREWER:  It is, but, you know, by just leaving

7   people to just say, hey, go file suit, well, then that's

8   what they're going to do; they're going to sue everybody.

9          THE COURT:  Right.

10          MR. BREWER:  So, I just don't think that's a very

11   reasonable way to do it, frankly, but --

12          THE COURT:  Well, what do you think ought to

13   happen with this estate?

14          MR. BREWER:  Well, what I thought should happen,

15   and the way I filed it was as a reorganization so that we

16   could, in a business-like manner, move into a new management

17   agreement for each one of these stores so that the

18   individual workforce that was there at the store could take

19   over and run the shops.  And then we could pay off the

20   creditors as we went -- work out a pay out plan with the,

21   which of course we've largely done anyway.  And, you know,

22   just try to go down the road and get some sort of a new

23   footing to try to keep the businesses alive.

24          THE COURT:  When did the EMC get formed up, and

25   when did it get the management contract?


JUDICIAL TRANSCRIBERS OF TEXAS, INC.

Case 4:11-cv-00542   Document 20   Filed in TXSD on 02/23/11   Page 54 of 58
Case 4:11-cv-00542   Document 17   Filed in TXSD on 02/23/11   Page 50 of 54
Case 08-33689   Document 48   Filed in TXSB on 04/21/09   Page 22 of 26

22

1                    MR. BREWER:  It only has a management contract for

2      two or three shops.

3                    THE COURT:  And when did it get formed up?

4                    MR. BREWER:  It got formed in -- I believe in

5      April of this year, but I'm not positive, Judge.

6                    THE COURT:  So that was before this entity filed

7      Chapter 11?

8                    MR. BREWER:  Probably about six or eight weeks

9      before.

10                   THE COURT:  So there were no revenues here?

11                   MR. BREWER:  No revenues where?

12                   THE COURT:  To reorganize in the entity that you

13     filed bankruptcy for.  How was it going to possibly

14     reorganize if it had no revenues?

15                   MR. BREWER:  I'm not --

16                   THE COURT:  You've taken all the management

17     contracts and put them into EMC.  You're saying you filed a

18     Chapter 11 so that they could reorganize.  How can they

19     reorganize with zero revenue?

20                   MR. BREWER:  Because, Judge, it's the same

21     business.  It's the same location; it's the same book shop.

22                   THE COURT:  So, they have none of the revenues of

23     it.  How could this entity reorganize?

24                   MR. BREWER:  Well, I'm not -- You mean the SSG?

25                   THE COURT:  No, the one you filed bankruptcy for,

Case 4:11-cv-00542  Document 20  Filed in TXSD on 02/23/11  Page 55 of 58
Case 4:11-cv-00542  Document 17  Filed in TXSD on 02/23/11  Page 51 of 54
Case 08-33689  Document 48  Filed in TXSB on 04/21/09  Page 23 of 26

23

1   the St Stephen the Great, LLC entity?

2          MR. BREWER:  Well --

3          THE COURT:  If all its revenues have been moved

4   over to another entity, how in the world could it possibly

5   reorganize?

6          MR. BREWER:  Judge, as I tried to explain before,

7   all SSG was and is was a management company.

8          THE COURT:  Whatever it is --

9          MR. BREWER:  So all --

10         THE COURT:  You've just told me you did it so that

11  it could reorganize.  How was it theoretically possible for

12  it to reorganize if it had no revenues?

13         MR. BREWER:  What I was trying to say, perhaps --

14  When I say it's trying to reorganize, I'm talking about the

15  overall charity.

16         THE COURT:  I'm talking about the entity that you

17  put into bankruptcy in my court.  How could it reorganize?

18  You put it in a reorganization Chapter 11, if you've taken

19  all the revenues and put into a sister company; how could

20  the company that you put into bankruptcy reorganize in a

21  Chapter 11?

22         MR. BREWER:  Well, when you asked me that two

23  months ago, my answer was that it was, I thought a self-

24  liquidating reorganization.  That's -- That was my

25  understanding what we were trying to accomplish.

Case 4:11-cv-00542 Document 20 Filed in TXSD on 02/23/11 Page 56 of 58
Case 4:11-cv-00542 Document 17 Filed in TXSD on 02/23/11 Page 52 of 54
Case 08-33689 Document 48 Filed in TXSB on 04/21/09 Page 24 of 26

24

1      **THE COURT:**  Okay.  Then what would it liquidate?

2      **MR. BREWER:**  What I discussed -- What I discussed

3  with the solicitors and the insolvency experts earlier in

4  this year in the U.K. was that we needed to form these

5  separate entities to take over the management, basically to

6  create a bridge to get the new managers in place, which

7  we've done --

8      **THE COURT:**  What did this entity have to

9  liquidate?

10      **MR. BREWER:**  Well, I did file an amended schedule,

11  which counsel didn't mention, but I -- I've got in here --

12  There's a lot of litigation that's worth 6.6 million

13  dollars, according to our estimates.  It's got a couple of

14  small debts, and then it's got about $155,000 worth of

15  retail purchasers who buy on account.  So, these are all

16  assets that should be collected and used to distribute to

17  the creditors.

18      **THE COURT:**  Who are Greenfield Dosser and

19  Kingston?

20      **MR. BREWER:**  These are individuals.  Greenfield is

21  an individual who is a member of the clergy staff at one of

22  the cathedrals where we have a book shop, who, in writing,

23  called for a boycott of that particular shop and caused her

24  to be shut down.

25      **THE COURT:**  How come those things weren't listed

Case 4:11-cv-00542   Document 20   Filed in TXSD on 02/23/11   Page 57 of 58
Case 4:11-cv-00542   Document 17   Filed in TXSD on 02/23/11   Page 53 of 54
Case 08-33689   Document 48   Filed in TXSB on 04/21/09   Page 25 of 26

25

1   in your original petition?

2          MR. BREWER:  I don't have an answer for that,

3   Judge.  I mean --

4          THE COURT:  I am dismissing this case.

5          MR. BREWER:  Okay.

6          THE COURT:  I think that this was filed in the

7   utmost of bad faith from everything I've heard.

8          MR. BREWER:  Judge, I told you I --

9          THE COURT:  I'm telling you what I have found.

10         MR. BREWER:  And I tried to do the best I could.

11         THE COURT:  Quiet.  This case was filed in the

12  utmost of bad faith.

13         MR. BREWER:  No, it wasn't, Judge.

14         THE COURT:  Stop.  This case was filed in bad

15  faith.  It was not filed for the benefit of the creditors or

16  of the estate in any way of the entity that filed

17  bankruptcy.  It should not have been filed at all.  It

18  should not have been filed in the United States if it was

19  going to be filed.  It was filed here to hide from creditors

20  from everything that I can tell.  It was filed to support,

21  apparently, some other entities that are controlled by the

22  Brewers.  And it was not filed for any legitimate purpose.

23             I do not know if it was filed in a fraudulent

24  or criminal matter -- manner, and I will leave that up to

25  the United States Trustee to investigate.


JUDICIAL TRANSCRIBERS OF TEXAS, INC.

Case 4:11-cv-00542  Document 20  Filed in TXSD on 02/23/11  Page 58 of 58
Case 4:11-cv-00542  Document 17  Filed in TXSD on 02/23/11  Page 54 of 54
Case 08-33689  Document 48  Filed in TXSB on 04/21/09  Page 26 of 26

26

1               This case is dismissed.  It is dismissed with

2    prejudice.  We will retain jurisdiction for 60 days to take

3    any sanctions motions that might be filed against the filers

4    of this case.

5               We're in adjournment.

6        (These proceedings concluded at 11:38:03)

7

8

9

10   *I certify that the foregoing is a correct transcript from*

11   *the electronic sound recording of the proceedings in the*

12   *above-entitled matter.*

13   */s lmartin*

14   _____

15   *JUDICIAL TRANSCRIBERS OF TEXAS, INC.*

16   *JTT JOB/INVOICE # 27519*

17   *DATE:  APRIL 20, 2009*

18

19

20

21

22

23

24

25               *  *  *  *  *


                    JUDICIAL TRANSCRIBERS OF TEXAS, INC.