**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **S & T OIL EQUIPMENT &** | § | |
| **MACHINERY, LTD., et al** | § | |
| **Plaintiffs** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. H-11-0542** |
| | § | |
| **JURIDICA INVESTMENTS** | § | |
| **LIMITED, et al** | § | |
| **Defendants.** | § | |

## <u>REPLY IN SUPPORT OF MOTION TO DISMISS IN FAVOR OF ARBITRATION</u>

Attempting to avoid dismissal, Plaintiffs offer the same arguments this Court rejected when denying their motion for injunctive relief. First, Plaintiffs try to establish that Juridica Investments Limited ("JIL") is a U.S. citizen, thereby making 9 U.S.C. § 202 and the Convention inapplicable. When making this argument, Plaintiffs focus exclusively on alleged acts by the other two defendants – Juridica Capital Management Limited ("JCML") and Juridica Capital Management (US) Inc. ("JCMUS"). But JIL's citizenship and principal place of business depend on *JIL's* acts, not those of legally distinct entities. The undisputed record evidence conclusively establishes that JIL maintains its principal place of business in Guernsey and is a Guernsey citizen. Therefore, the Convention applies, and dismissal of this lawsuit is required.

As a fallback, Plaintiffs now ask the Court to take discovery into JIL's operation and management. Not only would such discovery be an improper fishing expedition, but it is also unnecessary. Because even if – for the sake of argument – Plaintiffs were to establish that JIL is a U.S. citizen under 9 U.S.C. § 202, Defendants' opening brief offered two additional, independent bases for enforcing the arbitration provision. And Plaintiffs cannot rebut them.

First, the Convention applies even to disputes involving only U.S. citizens if there is a reasonable connection to a foreign state or another important foreign element. Here, the indisputable facts show that Plaintiffs entered into a contract with a Guernsey company; they sold an interest in an arbitration against the government of Romania; they sold a security interest in a Romanian company; and the arbitration was pending before the International Centre for Settlement of Investment Disputes (the "ICSID"), which was established by the World Bank and is itself considered an "international organization" by the United States government. Foreign and international contacts permeate the parties' relationship, and these contacts serve as an independent basis for applying the Convention to the parties' arbitration agreement.

Second, even if the Convention did not apply, arbitration would be required under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (the "FAA"). Plaintiffs dispute this assertion but have not provided any authority to the contrary. And their position makes no sense. If the Convention does not apply because JIL is a U.S. citizen, then the Court is faced with an arbitration provision in a contract between two U.S. citizens. And just like in any other domestic case involving an arbitration clause, the FAA would require the Court to enforce that provision. The Sixth Circuit addressed this point directly in *Inland Bulk Transfer Co. v. Cummins Engine Co,* 332 F.3d 1007 (6th Cir. 2003), which is discussed below. Plaintiffs have not provided any contrary authority, and, again, no discovery is necessary on this point.

Accordingly, whether analyzed under the Convention or under the FAA, arbitration is required. Defendants ask the Court to grant their Motion to Dismiss and to deny Plaintiffs' request for discovery.

I.      **THE CONVENTION REQUIRES DISMISSAL OF THIS ACTION.**

A.      **JIL is a citizen of Guernsey, not the United States.**

Plaintiffs' primary argument against application of the Convention is their assertion that JIL is a U.S. citizen because it is allegedly managed and controlled from New York.  (Dkt. No. 30 at 9.)  In making this argument, Plaintiffs do not offer any evidence regarding JIL.  And, more specifically, Plaintiffs do not offer any facts to rebut the record evidence that JIL is a Guernsey company publicly listed on London's AIM; JIL's only office is in Guernsey; JIL's registered agent is in Guernsey; JIL's shareholders are primarily large British institutional investors; JIL is directed and controlled by a three-member board of directors, two of whom are British citizens living in England and Guernsey; JIL executes all contracts in Guernsey; JIL maintains its accounts in Guernsey; JIL holds its funds in Banks in Guernsey; JIL disburses all funds used for investments from Guernsey; and JIL conducts the majority of its quarterly board meetings in Guernsey.  (March 10 Order, Dkt. 29, at 7 (citing Sullivan Declaration at ¶¶ 4, 5, 28).)  All of these factors support a finding that JIL's principal place of business is in Guernsey.  *See, e.g., Guitar Holding Co., L.P. v. El Paso Natural Gas Co.,* EP-10-CV-214-KC, 2010 U.S. Dist. LEXIS 85817, at *8-*9 (W.D. Tex. Aug. 18, 2010) (listing factors considered under nerve center test).

Instead of disputing these facts, Plaintiffs argue that, despite this evidence, JIL's principal place of business under the Supreme Court's "nerve center" test is New York because "that is where it [JIL] is controlled."  (Dkt. No. 30 at 9.)  Plaintiffs then assert that, "[s]pecifically, in connection with this case[,] all material matters were initially handled by JCML, later JCML-US, by and through Timothy Scrantom, Mark Broadwater and Paul Sullivan (all of which [*sic*] reside in the United States) . . . ."  (Dkt. No. 30 at 9-10.)  Plaintiffs then spend the next four (4) pages of

their Opposition alleging that the officers of JCML and JCMUS made various decisions regarding the investments being managed on JIL's behalf. (Dkt. No. 30 at 10-13.)

But Plaintiffs are focusing on the wrong company. As a matter of law, any actions by the officers, directors or employees of JCML and JCMUS are irrelevant for determining *JIL's* principal place of business. The Supreme Court implicitly made this point in *The Hertz Corp. v. Friend,* 130 S. Ct. 1181 (2010), when it explained that, for purposes of diversity jurisdiction, a corporation's principal place of business or "nerve center" will be "the place where *a corporation's* officers direct, control and coordinate *the corporation's* activities." *Id.* at 1192 emphasis added).

The First Circuit addressed this point directly in *Topp v. CompAir Inc.,* 814 F.2d 830 (1st Cir. 1987). In that case, CompAir was a company providing administrative and financial services for its operating subsidiaries. *Id.* at 831. CompAir itself had limited operations, and its office was located in New Hampshire. *Id.* at 831. Its wholly-owned subsidiaries, however, operated in five different states. *Id.* at 832. In its order denying defendants' motion to dismiss for lack of diversity, the district court applied the nerve center test to hold that CompAir was not a citizen of New Hampshire. *Id.* Instead, the district court held that "the shots were called from England," which was the headquarters for CompAir's parent company. *Id.*

The First Circuit reversed and held that the district court erred by ignoring the corporate distinction between CompAir – the party whose citizenship was at issue – and its parent company. *Id.* at 834-35. The First Circuit explained: "the court erred because the nerve center test does not grant free license to ignore the separate corporate identity of the corporation whose citizenship is being sought." *Id.* at 835. *See also Astra Oil Trading NV v. Petrobras Am. Inc.,* Case No. H-09-1274, 2010 U.S. Dist. LEXIS 78573, at *6 (S.D. Tex. Aug. 4, 2010) ("Generally,

4

when a subsidiary is incorporated separate from its parent, it is treated as an independent entity for purposes of determining federal court jurisdiction."). These authorities are consistent with the Court's holding in its March 10 Order that Plaintiffs had not demonstrated "a substantial likelihood that they can prove that the United States is where JIL's officers direct, control, and coordinate JIL's activities. . . . Indeed, Plaintiffs' evidence establishes that Fields and Scrantom are employed by [JCML], a separate company incorporated in Guernsey with whom JIL has an Investment Management Agreement." (Dkt. No. 29 at 8.)

Plaintiffs do not dispute that JCML and JCMUS are legally distinct from JIL. Nor do they provide any evidence or authority for the proposition that the Court should look to the acts of JCML or JCMUS to determine JIL's nerve center.[1]   The undisputed record evidence submitted by JIL establishes that its principal place of business is in Guernsey. Thus, there is no evidentiary basis for Plaintiffs' claim that JIL is a U.S. Citizen or for denying Defendants' motion to dismiss.

Realizing this fact, Plaintiffs attempt to avoid dismissal by requesting discovery into "defendants' citizenship." (Opp. at 41.) Defendants believe any such discovery would amount to nothing more than a fishing expedition and would be improper. *See, e.g., Hawkins v. Wells Fargo Bank, N.A.,* 1:07cv399, 2008 U.S. Dist. LEXIS 30857, at *3-*4 (S.D. Miss. Feb. 29, 2008) (denying motion to take discovery before responding to motion to compel arbitration where requested discovery was nothing more than a "fishing expedition"). Nonetheless, the

---

[1]   Plaintiffs rely heavily on *Astra*. (Dkt. 30 at 14 (describing the issues in *Astra* as "identical" to those here).) But Plaintiffs incorrectly describe the facts of that case and the court's ultimate holding. The issue in *Astra* was whether a subsidiary's principal place of business was where its only executive officer controlled the day-to-day operations of the company or whether it was where the *parent company's* board controlled the strategic direction of the company. *Astra,* 2010 U.S. Dist. LEXIS 78573, at *8. The *Astra* court ultimately held that it was required to respect the corporate distinctions between the subsidiary and its parent and that the subsidiary's principal place of business was determined by where its own officer controlled the company. *Id.* at *22. Quoting *Topp,* the *Astra* court stated: "[W]here the corporate separation between a parent and subsidiary, though perhaps merely formal, is real and carefully maintained, the separate place of business of the subsidiary is recognized in determining jurisdiction, even though the parent corporation exerts a high degree of control through ownership or otherwise." *Id.* The *Astra* decision fully supports JIL's position that its principal place of business must be considered separately from that of either JCML or JCMUS.

Court need not reach that issue.  As set forth in Defendants' opening brief and as further explained below, there are two additional, independent bases for dismissing the suit.  And neither could even arguably require discovery.

### B.    Even if JIL were a U.S. citizen, the Convention would apply because of the numerous foreign elements surrounding the parties' relationship.

As set forth in Defendants' opening brief, JIL's citizenship is not the sole basis for invoking the Convention.  An arbitration agreement between two U.S. citizens is still covered by the Convention if the parties' "relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states."  9 U.S.C. § 202.  Here, there can be no reasonable dispute that the relationship between Plaintiffs and JIL satisfies each of these elements.  And any one of them is sufficient to invoke the Convention.

### 1.    The Investment Agreement has a reasonable relationship to one or more foreign states.

First, the whole purpose of the Investment Agreement was to provide JIL an interest in an international arbitration filed by Plaintiffs against the government of Romania for damages caused by Romania's expropriation of a Romanian company (the "Romanian Arbitration"). Plaintiffs contend that this fact is insufficient to establish a foreign connection because the arbitration was pending in Washington D.C. and being handled by Houston lawyers.  (Dkt. No. 30 at 23.)  But the physical location of the hearings is immaterial.  The Romanian Arbitration was pending before the International Centre for Settlement of Investment Disputes ("ICSID"). (Agreement p. 2.)  The ICSID is "an autonomous international institution established under the Convention on the Settlement of Investment Disputes between States and Nationals of Other States," which itself was organized under a "multilateral treaty formulated by the Executive Directors of the International Bank for Reconstruction and Development (the World Bank)."

(Second Sullivan Decl. (attached hereto as Ex. 1) ¶ 4 and Ex. A (attaching materials from ICSID's website). By Executive Order, the United States government recognizes the ICSID as an "[i]nternational organization entitled to enjoy the privileges, exemptions, and immunities conferred by 22 U.S.C. §§ 288 *et seq.*" 22 U.S.C. § 288; Exec. Order No. 11,966, 42 Fed. Reg. 4331 (1977).

In addition to being an arbitration pending before an international organization, there is another international aspect to the Romanian Arbitration. It was filed with the ICSID pursuant to the United States' Treaty with Romania Concerning the Reciprocal Encouragement and Protection of Investment (the "Romania Investment Treaty"). (Agreement § 1.28.) That treaty requires the United States and Romania to treat investments by nationals and companies of the other party no less favorably than investments by their "own nationals or companies, or of nationals or companies of any third country, whichever is the most favorable . . . ." Romania Investment Treaty, May 28, 1992, U.S.-Romania, Art. II, S. TREATY DOC. NO. 102-36. If U.S. nationals or companies such as Plaintiffs have a dispute with Romania relating to the treatment required under the treaty, they can submit the dispute to binding arbitration with the ICSID. *Id.* at Art. VI.3.(b)(i). The treaty expressly requires any arbitration initiated under the treaty to "be held in a state that is a party to the New York Convention." *Id.* at Art. VI.5.

Moreover, Plaintiffs entered into a sophisticated commercial transaction with a Guernsey company that required arbitration in that company's home forum. (Agreement §15.4.) This connection to Guernsey was not fortuitous or the result of any unilateral decision by JIL. The Investment Agreement itself states that (1) JIL is a Guernsey company, (2) JIL was executing the contract in Guernsey, (3) JIL would perform in Guernsey, and (4) English law would apply.

(Agreement pp. 2 and 27 and § 14.2.1.)  These factors distinguish this case from those cited by Plaintiffs at pages 17-18 of their Opposition.[2]

Because the Romanian Arbitration itself is covered by the Convention and because of the many international components to that arbitration and the parties' relationship, JIL's acquisition of an interest in the Romanian Arbitration is inherently international in character.  The Court should reject Plaintiffs' claim to the contrary, and it should hold that the parties' arbitration agreement is governed by the Convention.

## 2.  The Investment Agreement involves property located abroad.

Plaintiffs assert that the Investment Agreement does not relate to any property located abroad.  (Dkt. No. 30 at 25-27.)  Plaintiffs are wrong.  In Section 3.7, Plaintiffs granted to JIL a security interest in all "Collateral" to secure its various obligations under the Investment Agreement.  The term "Collateral" encompasses all "Assignor Interests," including all of Plaintiffs' rights in the Nitramonia Group – a Romanian joint stock company.  (Agreement §§ 1.7, 1.12, 1.23, 1.27.)

Because the Investment Agreement transferred an interest in a Romanian company, it involved property located abroad, and the Convention applies.

---

[2]  Plaintiffs incorrectly state that the Investment Agreement cannot form the basis of the foreign element under Section 202.  The authority they cite does not support that proposition.  Both *Ensco Offshore Co. v. Titan Marine L.L.C.*, 370 F. Supp. 2d 594 (S.D. Tex. 2005), and *Jones v. Sea Tow Servs. Freeport NY, Inc.*, 30 F.3d 360 (2d Cir. 1994), state only that the *arbitration and choice of law provisions* cannot serve as the sole basis for the foreign connection.  For example, in *Ensco*, two U.S. corporations entered into a contract to salvage a rig located 90 miles off the U.S. coast.  *Ensco*, 370 F. Supp. 2d at 595.  The parties' contract and relationship had no connection to England, except that the contract applied English law and required arbitration in London.  *Id.*  The *Ensco* court held that the arbitration agreement and choice of law were insufficient to establish a foreign element to the relationship.  The rationale in the *Jones* case was the same.  But the situation here is easily distinguishable because, unlike in *Ensco* or *Jones*, the Investment Agreement has numerous connections to foreign elements other than just the choice of law and arbitration provisions.  Also, unlike *Access Information Management of Hawaii, LLC v. Shred-It Am., Inc.*, 10-00622, 2010 U.S. Dist. LEXIS 116862 (D. Haw. Nov. 2, 2010), this is not a case where the parties' contract made no mention of the foreign country and the party seeking to invoke Section 202 did so based solely on unilateral contacts with that country about which the contract made no mention.  *Id.* at *16-*19.

### 3.    The Investment Agreement envisaged performance and enforcement abroad.

JIL's obligation under the Investment Agreement was to provide funds for the Romanian Arbitration.  Just as the Investment Agreement stated that JIL would perform in Guernsey, JIL in fact wired its investment from its Guernsey account.  (Second Sullivan Decl. ¶ 5 and Ex. B (attaching wire confirmation).)  Where a contract requires a party to pay money, the site of that party's performance is the place from which payment is made.  *Product Promotions, Inc. v. Cousteau*, 495 F.2d 483, 496 n.21 (5th Cir. 1974) (citing Texas authority for proposition that site of performance for payment is payor's domicile).  Therefore, JIL performed its obligations in Guernsey, which is, again, sufficient to invoke the Convention.  9 U.S.C. § 202.

Moreover, the Investment Agreement also contemplated enforcement abroad.  In addition to acquiring a security interest in the above Collateral, JIL acquired an interest in the Proceeds from any judgment in the Romania Arbitration.  (Investment Agreement §§ 3.1, 1.5, and 1.29.)  In order to collect on any such judgment, the parties would have to enforce the judgment against the government of Romania in Romania.  And a contract requiring enforcement abroad falls under Section 202.

## II.    EVEN IF THE CONVENTION DID NOT APPLY, DISMISSAL WOULD BE REQUIRED UNDER THE FAA.

Plaintiffs continue to misunderstand the interplay between the Convention and 9 U.S.C. § 202.  Distilled to its essence, Plaintiffs' argument is that the arbitration provision they signed with JIL is unenforceable because Plaintiffs and JIL are both U.S. citizens.  Accordingly – Plaintiffs argue – Section 202 requires the Court to ignore the arbitration provision, ignore the Federal Arbitration Act, and allow Plaintiffs to pursue their claims in this Court.

But this is not the law.  As explained below, the purpose of Section 202 was to ensure the enforceability of arbitration agreements across international boundaries, thereby enabling

companies to manage their international commercial relationships in a predicable manner. Nothing in Section 202 *restricts* a private party's ability to enter into an arbitration agreement. And nothing in Section 202 empowers a court to invalidate an arbitration provision on any grounds other than those applicable to all contracts under state law.

Therefore, if a particular arbitration agreement does not qualify as "international" as defined therein, Section 202 simply does not apply, and the agreement is considered to be "domestic."  And – just like any other arbitration agreement between two U.S. citizens – such a "domestic" agreement is governed by the Federal Arbitration Act codified at 9 U.S.C. § 1 *et seq.*

### A.      The FAA applies to all arbitration agreements.

As a preliminary matter, the Federal Arbitration Act generally applies to all agreements to arbitrate.  Section 2 of the FAA broadly states:

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  "Commerce" is defined to include both commerce "among the several States" and commerce "with foreign nations." 9 U.S.C. § 1.

Consequently, unless some other federal statute removes a particular arbitration agreement from its scope, Section 2 applies and requires the Court to enforce the arbitration agreement's terms except to the extent the contract is found to be invalid or unenforceable under general principles applicable to all other types of contracts.

**B.**    **9 U.S.C. § 202 creates a subclass of "international" arbitration agreements governed by the Convention; it does not provide a basis for invalidating arbitration agreements to which it does not apply.**

Section 202 creates a subclass of arbitration agreements that, in addition to being subject to the general provisions of the FAA, are also subject to the Convention.  This subclass consists of all commercial arbitration agreements that either (1) involve a non-U.S. citizen, (2) involve property, performance, or enforcement abroad, or (3) have some reasonable relationship to a foreign state.  9 U.S.C. § 202.  Section 202 states:

> An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title [9 USCS § 2], falls under the Convention. An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states.

9 U.S.C. § 202.

Congress enacted 9 U.S.C. §§ 201 *et seq.* in order to implement the Convention.  9 U.S.C. § 201.  The Convention was adopted to address difficulties parties were having when trying to enforce arbitration awards rendered in a country other than where enforcement was sought.  As explained by the Second Circuit:

> [T]he Convention reflects the efforts of businessmen involved in [international] trade to provide a workable mechanism for the swift resolution of their day-to-day disputes.  International merchants often prefer arbitration over litigation because it is faster, less expensive and more flexible.  But previous international agreements had not proved effective in securing enforcement of arbitral awards; nor had private arbitration through the American Arbitration Association, the International Chamber of Commerce, the London Court of Arbitration and the like been completely satisfactory because of problems in enforcing awards. . . .
>
> In 1958, a convention was called to deal with these problems.

*Bergesen v. Joseph Muller Corp.,* 710 F.2d 928, 929 (2d. Cir. 1983).   Accordingly, the Convention was designed to ensure that arbitration awards rendered in one country will be enforced by other countries participating in the Convention.   It was not intended to affect the signatory nations' domestic arbitration laws.

While Section 202 defines the "international" arbitration agreements to which the Convention applies, the subsequent sections set forth substantive provisions that apply only to those "international" agreements.   For example, Section 203 provides the district courts with original jurisdiction over all actions or proceedings falling under the Convention – regardless of the amount in controversy:

> An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States (including the courts enumerated in section 460 of title 28 [28 USCS § 460]) shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy.

9 U.S.C. § 203.   Thus, a case involving an "international" arbitration agreement can be pursued in federal court regardless of whether there is complete diversity among the parties and regardless of the amount in dispute.   In contrast, a case involving an arbitration agreement that is not subject to the Convention – or, in other words, a "domestic" agreement between two U.S. citizens without any foreign connection – cannot be brought in federal court unless there is an independent basis for federal subject matter jurisdiction.   *Smith v. Rush Retail Ctrs., Inc.,* 360 F.3d 504, 506 (5th Cir. 2004) (holding that FAA does not create independent subject matter jurisdiction).

Similarly, Section 206 empowers the district court to compel the parties to an international arbitration agreement to arbitrate as provided in the parties' agreement, even if the order to compel would require the parties to conduct the arbitration outside of the court's district:

> A court having jurisdiction under this chapter [9 USCS §§ 201 et seq.] may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States. Such court may also appoint arbitrators in accordance with the provisions of the agreement.

9 U.S.C. § 206. In contrast, a district court considering a "domestic" arbitration agreement under the FAA can only compel the parties to arbitrate if the site of that arbitration is within the court's geographical district. 9 U.S.C. § 4.

Section 207 gives parties to an international arbitration three (3) years to confirm any award in a federal court. 9 U.S.C. § 207. But for "domestic" arbitrations, the FAA requires a party to seek confirmation within one (1) year. 9 U.S.C. § 9.

In short, both the FAA and Section 202 provide for the enforcement of arbitration agreements. Section 202 applies to "international" arbitration agreements; the FAA applies to all others. But regardless of which statutory scheme applies, arbitration agreements are generally enforceable and cannot be ignored except under limited circumstances where the Court finds them to be unenforceable under general principles applicable to all other contracts.

Nothing in Section 202 or the Convention requires or empowers the Court to invalidate an arbitration provision merely because the Convention does not apply. To the contrary, such a holding would make no sense. By definition, domestic arbitration agreements do not fall under the Convention, yet they are indisputably enforceable under the FAA.

**C.    The Sixth Circuit's opinion in *Inland Bulk Transfer Co. v. Cummins Engine Co.* and applicable legislative history illustrate the proper analysis under Section 202 and the FAA.**

The proper interplay between Section 202 and the FAA is illustrated by the Sixth Circuit's opinion in *Inland Bulk Transfer Co. v. Cummins Engine Co*, 332 F.3d 1007 (6th Cir. 2003), where the court applied the FAA to enforce a contract provision requiring two U.S. citizens to arbitrate in France. There, Inland Bulk sought to purchase naval propulsion engines

from Cummins. *Id.* at 1009.  One of the quotes provided to plaintiff stated that it was subject to

the "General Sales Terms and Conditions," which included the following arbitration provision

requiring any arbitration to be conducted in France:

> All disputes arising in connection with the present Contract shall
> be finally settled under the Rules of Conciliation and Arbitration of
> the International Chamber of Commerce by one or more arbitrators
> appointed in accordance with the said Rules.   The arbitration
> proceedings shall be in the English language and will take place in
> Paris, France.

*Id.* at 1010.

The transaction proceeded, and a dispute subsequently arose.  *Id.*  Rather than filing an

arbitration in France, Inland Bulk filed suit in the Northern District of Ohio.  *Id.*  Cummins filed

a motion to stay the case and compel arbitration in France.  *Id.*  The district court denied

Cummins' motion.  *Id.*

The Sixth Circuit reversed, holding that the FAA required the court to stay the litigation.

*Id.* at 1018.  In reaching this result, the Sixth Circuit held that (1) the Convention did not apply to

a domestic dispute between two U.S. citizens required to arbitrate in France; (2) the district court

could therefore not rely on Section 206 to compel arbitration in France; (3) the FAA did not

allow the court to compel arbitration outside of its district; but (4) the FAA required the court to

stay the litigation pending arbitration.  *Id.*  The Sixth Circuit explained:

> [T]he Federal Arbitration Act prevents federal courts from
> compelling arbitration outside of their own district. *See* 9 U.S.C. §
> 4 (stating that the arbitration must take place "within the district in
> which the petition for an order directing such arbitration is filed") .
> . . . The Convention on the Recognition and Enforcement of
> Foreign Arbitral Awards does allow federal courts to order
> arbitration abroad in international commercial disputes in some
> circumstances.  *See* 9 U.S.C. § 201 *et seq.*   The Convention,
> however, is clearly inapplicable here, because all the parties are
> United States citizens, and the contract involved exclusively
> domestic property and domestic performance. . . . Thus the district
> judge correctly refused to compel arbitration.

> \*\*\*
>
> In summary, . . . we **REVERSE** the district court's denial of the motion to stay the proceedings pending arbitration. We **REMAND** to the district court for further proceedings in accordance with this opinion, directing that a stay of proceedings pending arbitration be entered.

*Id.*

The Sixth Circuit's analysis is supported by Section 202's legislative history. In the hearing held before the Senate's Committee on Foreign Relations on February 9, 1970, Richard D. Kearney, Chairman of the Secretary of State's Advisory Committee on Private International Law, testified regarding the intent behind Section 202. Mr. Kearney explained that the United States did not intend to make any changes to domestic arbitration law by enacting Section 202, and that Section 202's exclusion of disputes between U.S. citizens was to ensure that all such disputes would continue to be governed by the domestic FAA:

> As was stated in the hearings on the Convention, . . . our purpose in adhering to the Convention is for the beneficial effects it will produce for the foreign commerce of the United States and not to make any changes with respect to matters that are traditionally within the jurisdiction of the 50 States of the Union.
>
> \*\*\*
>
> At the same time we were faced with the problem that section 1 of the [Arbitration] act, which defines commerce, specifically includes both interstate and foreign commerce, while the implementation of the Convention should be concerned only with foreign commerce. *Consequently it was necessary to modify the definition of commerce to make it quite clear that arbitration arising out of relationships in interstate commerce remains under the original Arbitration Act and is excluded from the operation of the proposed chapter 2.*
>
> To achieve this result we have included in section 202 a requirement that any case concerning an agreement or award solely between U.S. citizens is excluded unless there is some important foreign element involved . . . .

S. REP. NO. 91-702, Appx. at 33 (1970) (emphasis added) (excerpt attached hereto as Ex. 2).

*Inland Bulk* and the legislative history of Section 202 compel the conclusion that, even if the Convention did not apply, the FAA would.  Under that circumstance, the Court would be faced with a contract among sophisticated commercial parties who agreed to resolve all of their disputes by arbitration.  Such a contract would fall squarely under the FAA and would require this Court to stay or dismiss this case pending arbitration, unless there were some independent basis for refusing its enforcement.  And as discussed below, there is no such basis.[3]

## III.   THE COURT SHOULD AGAIN REJECT PLAINTIFFS' ASSERTION THAT THE ARBITRATION AGREEMENT IS UNCONSCIONABLE.

As a fallback position, Plaintiffs repeat their assertion that the arbitration provision was obtained by fraud and is unconscionable.  The Court rejected these arguments in its March 10, 2011 Order denying Plaintiffs' Motion for a Temporary Restraining Order, and it should reject them again here.

First, with respect to the fraud allegation, Plaintiffs mistakenly assume that Lord Brennan's membership to the LCIA "is a requirement to advocate in the LCIA" and thus somehow creates a conflict of interest.  (Dkt. No. 30 at 37.)  As explained on the LCIA's website, membership is not required to appear before the LCIA.  (Second Sullivan Decl., ¶ 6 and Ex. C.)  Indeed, membership to the LCIA is akin to membership in a bar association – it is available for a subscription fee and merely gives the member access to various published materials and educational seminars:

> The LCIA's dispute resolution services are available to all contracting parties, without any membership requirements.

---

[3] *Ensco* did not analyze whether the FAA applies to an agreement where Section 202 is inapplicable and it did not mention *Inland Bulk*.  But to the extent *Ensco* is inconsistent with *Inland Bulk* and the above legislative history, Defendants maintain that it was incorrectly decided.

> However, in addition to those services, the LCIA does have a general membership for which it organises a worldwide programme of conferences, seminars and other events of interest to the arbitration and ADR community. This general membership is organised into Users' Councils, which have been established to provide and maintain its worldwide services and to meet the developing needs of the business community.

(http://www.lcia.org/Membership/Membership.aspx.)  Plaintiffs cannot predicate a fraud claim on the alleged failure to disclose such immaterial information. *See, e.g., Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.,* 51 S.W.3d 573, 577 (Tex. 2001) (fraud claim requires material misrepresentation).

Next, Plaintiffs assert that the arbitration provision is unconscionable because it would have to pay certain hourly fees to the LCIA, it would have to pay the arbitrators, and the cost of a plane ticket from Chicago to Guernsey is just over $2,000 more than a plane ticket to Houston. (Dkt. No. 30 at 38.)  As the Court noted in its March 10 Order, Plaintiffs "do not estimate the total cost of arbitrating in Guernsey or provide any information regarding the expense to the parties of litigating in this Court." (Dkt. No. 29 at 12.)  Nor have Plaintiffs submitted any evidence showing that they lack the funds to cover the necessary costs. (Dkt. No. 29 at 15 and n. 26.)  Without any of the above information, Plaintiffs have not satisfied their burden of showing that the arbitration provision at issue is unconscionable.  Indeed, under Plaintiffs' rationale, every arbitration provision requiring a venue other than Chicago would be unconscionable because it would require the payment of travel expenses and arbitrators that would not have to be paid if the parties were instead required to litigate there.  That is not the correct standard, and Plaintiffs' assertions in that regard should be rejected.

Plaintiffs argue that arbitration in Guernsey is unconscionable because it cannot compel witnesses who are U.S. citizens to testify live at any evidentiary hearing there. (Dkt. No. 30 at 39.)  But that is also true in this Court – the Court can compel witnesses to testify in person only

if they reside in Texas or within 100 miles of the courthouse.  Fed. R. Civ. P. 45(c)(3)(A)(ii).  All other witnesses who refuse to appear voluntarily must be presented through deposition testimony.  This is not a basis for finding an arbitration agreement unconscionable.

Finally, Plaintiffs assert that the arbitration provision is unconscionable because they did not receive independent counsel.  (Dkt. No. 30 at 40.)  As the Court stated at page 14 of its March 10 Order, this assertion is contradicted by the evidence before the Court.  (Dkt. No. 29 at 14 (citing to executed opinion regarding enforceability of arbitration provision by Illinois attorney Stuart Spiegel).  Plaintiffs have not offered any evidence to rebut Defendants' assertion that Mr. Spiegel was Plaintiffs' attorney and that he is not associated with King & Spalding.  Nor have they provided any response to the Court's observation that the title page of the Investment Agreement includes a reference to the arbitration provision that "stands alone in bold, and is at least 16 pt. font.  The sentence could not be overlooked and gave Plaintiffs fair notice to check the details of the arbitration requirements."  (Dkt. No. 29 at 13, n. 23.)  Plaintiffs are sophisticated parties who have participated in international corporate transactions.  There was nothing procedurally unconscionable about the inclusion of the arbitration provision in the Investment Agreement.

## IV.   CONCLUSION

For all of the above reasons and those stated in Defendants' opening brief, the Court should dismiss this case in favor of the Investment Agreement's arbitration provision.

Respectfully submitted,

**THOMPSON & KNIGHT LLP**


By: */s/ Jonathan B. Shoebotham*
Jonathan B. Shoebotham
State Bar Number 18286800
333 Clay Street, Suite 3300
Houston, Texas   77002
(713) 654-8111 Telephone
(713) 654-1871 facsimile

Attorney In Charge for Defendants
Robert D. MacGill (#9989-49)
Mark J. Crandley (#22321-53)
Scott E. Murray (#26885-49)
Barnes & Thornburg LLP
11 South Meridian Street
Indianapolis, Indiana   46204
(317) 236-1313 Telephone
(317) 231-7433 Facsimile

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2011, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the following:

> J. Mark Brewer
> Brewer Pritchard, PC
> Three Riverway, Suite 1800
> Houston, Texas   77056
> Phone:  713-209-2950
> Fax:  713-659-5302
> E-mail:  brewer@bplaw.com

/s/ *Jonathan B. Shoebotham*
Jonathan B. Shoebotham